UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

BELDEN INVESTMENTS, L.L.C.

CIVIL ACTION

VERSUS

NO. 22-62-JWD-SDJ

PHARAOH OIL & GAS, INC., ET AL.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The following are the Court's Findings of Fact and Conclusions of Law deciding a claim by Belden Investments, L.L.C.[1] ("Belden"[2] or "Plaintiff") against Pharaoh Oil & Gas, Inc. ("Pharaoh" or "Defendant")[3] and Pharaoh's counterclaim against Belden. If any of the following findings of fact are in truth conclusions of law, or if any conclusions of law are in truth findings of fact, the Court deems them so.

## I.    FACTUAL BACKGROUND

1. Belden Investments, L.L.C. "is a Louisiana limited liability company whose two members, Martin L. Belden and Marcille Belden, are citizens of the State of Louisiana." (Uniform Pre-trial Order ("PTO"), Doc. 57 at 1.) According to M. Belden, Plaintiff Belden was "a small company . . . just me and my wife really." (Doc. 91 at 26.) He described the business as a "marine boat business. I do a little construction work. A little boat rental business, a little bit of everything." (*Id.*) "I could do just one job at a time." (*Id.* at 71; *see also*

---

[1] Although Martin Belden testified his company did business as Amphibious Marine, (Transcript morning session, Doc. 91 at 70–71), suit was brought only in the name of Belden Investments, L.L.C., and the invoices at the heart of the suit were only in the name of Belden Investments, L.L.C. (*See* Plaintiff's Exhibits, 1A – 1L.)

[2] Martin Leland Belden is the owner of Belden Investments, L.L.C. (Doc. 91 at 26) and the principal witness on its behalf. To avoid confusion, the Court will use "M. Belden" when referring to the individual and not the company.

[3] For clarity and convenience, although Belden is both a plaintiff and defendant in reconvention, its exhibits will be referred to as Plaintiff's exhibits. Similarly, although Pharaoh is a plaintiff in reconvention as well as a defendant in the main demand, its exhibits will be referred to as Defendant's exhibits.

Transcript of afternoon session, Doc. 92 at 13–14 ("The only office overhead I have is my wife.").)

2. Pharaoh Oil & Gas, Inc. is a Texas corporation with a principal place of business in the State of Texas. (PTO, Doc. 57 at 1.) Gary Otto Bolen ("Bolen") is President, CEO, and the "principal guy" of Pharaoh who started the company thirty years ago. (Doc. 92 at 46.) While it is not clear how many people are employed by Pharaoh, it is clear that Bolen is the sole decision maker at Pharaoh. (*Id.* at 79 ("I don't let any of my people, Elden [his foreman] or anyone else, they have no authority to ever touch anything.").)

3. At some point prior to 2010, Pharaoh "bought [the] Bayou Sorrel [Oil Field]" from National Energy Group, Inc. ( "NEG") and "started operating it[.]" (*Id*. at 46.)

4. The Bayou Sorrel Field ("Site" or "Bayou Sorrel Field") is located in Iberville Parish, Louisiana, and consisted of various oil wells and related pipelines, storage facilities, living quarters, and other equipment. (*See* Doc. 91 at 17, 52, 65, 92; Doc. 92 at 6.)

5. At some point before September, 2010, the Louisiana Commissioner of Conservation declared the twenty-nine wells in the Bayou Sorrel Field "an orphaned oilfield site[.]" (Plaintiff's Exhibit 4.)

6. At some point prior to 2010, the Louisiana Department of Natural Resources directed "all of the oil and gas companies that had ever operated in the Bayou Sorrel Field" in Iberville Parish to begin steps to clean up and restore the Site. (Doc. 52 at 1–2, citing Amended Petition, Doc. 26 at 3; *see also* Doc. 92 at 11.) Because Pharaoh was one of the last operators of the field, it had "an obligation to clean up Bayou Sorrel Field." (Doc. 92 at 11.)

7. In September of 2010, Pharaoh entered into a Cooperative Agreement with the Louisiana Office of Conservation wherein Pharaoh agreed to "have the orphaned wells properly plugged and abandoned and the associated equipment removed at no cost to OCC . . ." (Plaintiff's Exhibit 4 at 451.)[4] This is hereinafter sometimes referred to as the "Work".

8. Pharaoh, as one of the "last three operators got together" with the other two to "put some money together to decommission and P&A this area." (Doc. 92 at 11.)

9. Thereafter, in December of 2010, Pharaoh entered into a Reimbursement Agreement with the other two, NEG and SWEPI, LP ("SWEPI"),[5] wherein Pharaoh agreed to do the "well plugging, decommissioning and site restoration Work" of the Site "on a turnkey basis" for an amount "not to exceed $5,463,640." (Doc. 92 at 11; Plaintiff's Exhibit 5 at 456.)[6] The Reimbursement Agreement required NEG and SWEPI to reimburse Pharaoh for amounts expended in doing the Work "within thirty (30) days of confirmation and satisfaction by SWEPI and [NEG] that the Work has been completed and the State is satisfied . . ." (Plaintiff's Exhibit 5 at 456.)

10. In mid-June, 2013, Pharaoh, SWEPI, and NEG entered into an Amended Reimbursement Agreement. (Plaintiff's Exhibit 6 at 458–461.) In it, the parties acknowledged that Pharaoh had performed some of the Work, but Pharaoh agreed to perform other specified Work. (*Id.* at 458.) The parties agreed that Pharaoh would be paid $963,640 within 15 days for plugging and abandoning 26 wells, (*id.*), and another $1,000,000 upon confirmation that it had performed the plugging and abandoning of "all 29 wells along with the removal of all associated pipelines and flowlines[,]" (*id.* at 459). The parties also agreed that upon

---

[4] The cited page numbers are the Trial Bates Numbers.
[5] On September 14, 2023, the Court dismissed SWEPI without prejudice as a defendant in Belden's suit. (Doc. 52.) The Court dismissed SWEPI with prejudice on April 17, 2024. (Doc. 53.)
[6] *See also* Bolen's confusing testimony regarding how Pharaoh joined with SWEPI and NEG to clean the Site.

confirmation of Pharaoh's completion of all the work described in the Scope of Work paragraph of the Amended Reimbursement Agreement, it would be paid "the remainder of the Contract Amount, $3,500,000." (*Id*.)

11. Bolen decided to hire a company to perform the work that Pharaoh had contractually agreed to accomplish. Bolen decided he needed "a junkyard dog like me to help us get this thing [the Bayou Sorrel Site] cleaned up, because it was real junky and everything." (Doc. 92 at 53.)

12. Pharaoh initially hired Dickie LeBlanc to do at least some of the work that it had contractually agreed to perform.[7]

13. Dickie LeBlanc, in turn, hired Belden to perform some of the work LeBlanc had agreed to do. (Doc. 92 at 4; Doc. 91 at 26–29.) Belden was not working directly for Pharaoh at that time but rather, was working "through [Dickie] LeBlanc." (Doc. 91 at 28–29.) According to M. Belden, this work was on the outlying wells. (*Id.* at 27.)

14. After Pharaoh had some problems with Dickie LeBlanc, Pharaoh's foreman Elden Miller asked M. Belden whether Belden would be interested in "continuing the work that Dickie LeBlanc had started." (*Id.* at 28.) It is unclear from the record when Dickie LeBlanc began and ended his Work at the Site and when Belden took over for Dickie LeBlanc.

15. At some point during the summer of 2013,[8] Bolen met M. Belden at the Site, and after deciding M. Belden was a "junkyard dog like me," (Doc. 92 at 57) Pharaoh entered into an

---

[7] It is undisputed that before the Oral Contract was entered into, Belden was working at the Site for Dickie LeBlanc who Pharaoh had originally hired to do the Work at the Site. (Doc. 91 at 26–27; Doc. 92 at 53–54.) Because of an incident at the Site, Dickie LeBlanc was fired from the job and Belden was hired by Pharaoh to complete the work LeBlanc had been hired to perform. (Doc. 91 at 28–29.)

[8] The parties disagree as to the precise date of the Oral Contract. Belden contends it was entered into in "approximately July of 2013." (Doc. 98 at 2, ¶ 2.) Pharaoh contends they entered into the Oral Contract "[o]n or about June 15, 2013." (Doc. 93 at 2, ¶ 2, citing Doc. 9 at 52.) M. Belden's testimony is much vaguer than the representation made by Belden's counsel, M. Belden testifying that the initial walk through and the initial 50/50 offer on scrap was made "Summertime, June-ish, July somewhere - - [in 2013]." (Doc. 91 at 52.) Bolen's testimony also clouds the issue, testifying that the

4

oral contract ("Oral Contract" or "Contract") with Belden for Belden to clean the Site. (PTO, Doc. 57 at 7, Established Facts ("The parties agree that an [O]ral [C]ontract was entered into between Pharaoh and Belden with respect to clean-up efforts in the Bayou Sorrel Field[.]") *See also* Doc. 93 at 2, ¶ 2 (the Oral Contract was "for the purpose of decommissioning" the Site); *see also* Doc. 98 at 2, ¶ 2 (Belden "generally agreed to the cleanup and remediation activities related to decommissioning oil and gas equipment in Bayou Sorrel").)[9]

16. Both parties agree that Belden started the Work under the Oral Contract in mid-August of 2013. (Doc. 91 at 57, M. Belden Testimony; Doc. 92 at 133, Bolen Testimony; *see also* Doc. 98 at 2, ¶ 4.)

17. At some point or points during the time Belden was performing Work at the Site, Belden sent Pharaoh invoices totaling $1,673,073.61 for Belden's time and materials in connection with the Work. (Doc. 92 at 96; Plaintiff's Exhibits 1A – 1L; Plaintiff's Exhibits 2a and 2-b.)[10] The parties disagree whether the invoices were sent periodically over time as Belden contends, (Doc. 98 at 3, ¶ 6, citing Doc. 91 at 52, 59), or at one time as Pharaoh contends, (Doc. 93 at 9, ¶¶ 25–26).

18. While Belden was working at the Site, it is undisputed that Pharaoh sent Belden "at least $740,000 . . . through a series of checks and wire transfers." (PTO, Doc. 57 at 8, Established

---

Work, which began in mid-August 2013, began "pretty quick" after they met and reached the agreement. (Doc. 92 at 133–134.)

[9] In the Pretrial Order, Belden describes the work in more detail as "1. Plugging and abandonment of wells and related structures, 2. Removal of all pipelines and flowlines as directed by the State Department of Natural Resources, and in accordance with applicable leases and safety protocols, 3. Removal of the production platform and associated facilities located in the Bayou Sorrel Field, 4. Necessary site clean-up and remediation so as to meet regulatory and lease standards, and 5. Performance of any other task or activity as required by the State or jurisdictional regulatory agencies." (PTO, Doc. 57 at 2.)

[10] Plaintiff's Exhibits 1A through 1L purport to be Belden invoices sent to Pharaoh with supporting bills and documents. *See also* Defendant's Exhibit 10.

Fact.) The following amounts were sent by Pharaoh to Belden or Belden's counsel on or about the following dates:

| | |
|---|---|
| 8/14/13 | $50,000 |
| 9/6/13 | $50,000 |
| 12/9/13 | $100,000 |
| 2/6/14 | $50,000 |
| 3/4/14 | $40,000 |
| 4/16/14 | $100,000 |
| 5/27/14 | $50,000 |
| 6/13/14 | $100,000 |
| 7/18/14 | $200,000[11] |
| Total | $740,000 |

(Defendant's Exhibits 3-A, 3-B. *See also* Doc. 91 at 78–79.)

19. The parties disagree as to whether these amounts were sent to Belden as loans or as payment for services rendered. As is discussed in greater detail *infra*, Pharaoh claims these payments were loans made to Belden to help Belden continue and complete the Work. With the exception of the 8/14/13 payment of $50,000,[12] Belden claims they were partial payments made for services rendered and in response to invoices for time and materials

---

[11] This check bounced or was cancelled at Bolen's request, (Doc. 91 at 85; *see also* Doc. 92 at 25, 70, 100), but on November 14, 2014, the $200,000 was repaid to Belden as a part of the Letter Agreement reached between the parties, (Plaintiff's Exhibit 12; Defendant's Exhibit 7.). Pharaoh paid the $200,000 to Belden but SWEPI "put that back into the Fund where we could keep moving." (Doc. 92 at 101, 102, Bolen Testimony.) According to SWEPI's letter to Bolen, "You [Bolen] have advised that this advancement [sic] is for Pharaoh to pay Martin Belden for work that Mr. Belden has executed for Pharaoh." (Plaintiff's Exhibit 11 at Belden Trial 505.)

[12] According to Belden, this $50,000 "payment was specifically for the distinguishable work which remained to be done by Belden related to wellheads and cribbing after Dickie LeBlanc left the Bayou Sorrel Field." (Doc. 99 at 3–4.)

Belden submitted to Pharaoh pursuant to the Oral Contract. (Doc. 98 at 3, ¶ 7; *see also* Doc. 92 at 23.)

20. It is also undisputed that Belden sold certain materials taken from the Site for scrap for which Belden received $185,188.91 and which Belden credited to Pharaoh's account. (Plaintiff's Exhibit 3; Defendant's Exhibit 3-C.)

21. In June or July of 2014, Belden quit working and left the Site. Belden says it left on approximately July 15, 2014, "due to the outstanding balance and failure of Pharaoh to issue any additional payments." (Doc. 98 at 3, ¶ 9.) Pharaoh contends that "Belden quit working and left the Site with the job half complete . . . around mid-2014" because "Belden was not maximizing the profits from scrap." (Doc. 93 at 5, ¶ 11.)

22. Then the parties, through their attorneys, attempted to negotiate a resolution of the dispute so that Belden could return and complete the job. First, Pharaoh made a proposal dated August 14, 2014, (Defendant's Exhibit 6; *see also* Doc. 92 at 32–33), and then Belden offered a compromise in the form of a written contract dated November 11, 2014, (Plaintiff's Exhibit 7; *see also* Doc. 92 at 26–32). However, both offers were rejected. (Doc. 92 at 33, 31.)

23. In late November, 2014, a partial compromise was reached resolving certain collateral issues in a contract titled "Letter Agreement." (Defendant's Exhibit 11-C at PHA 108–12.) As a part of the agreement, Belden agreed "not to interfere with the Work in any way conceivable, including but not limited to appearing at the site of the work (other than to deliver [a] fuel barge) . . ." (*Id*. at PHA 109.) Pharaoh also agreed to pay Belden $200,000 to replace Bolen's "personal check delivered to Belden 'NSF' in the amount of $200,000." (Defendant's Exhibit 7 at PHA 33.) However, the main bone of contention between the

parties—what, if anything, was owed by Pharaoh to Belden and vice versa—was left unresolved.

24. Despite the Letter Agreement's provision prohibiting M. Belden from returning to the Site, both parties agree that Bolen, on behalf of Pharaoh, gave M. Belden permission to return to the Site on at least one occasion. (Doc. 92 at 72–74, 116–118, 132–133; Doc. 91 at 97, 103.) The parties disagree as to whether that permission extended beyond one visit to the Site.

25. After the Letter Agreement was signed, M. Belden returned to the Site on multiple occasions to do work for a third party, (*see, e.g.,* Doc. 91 at 101–116), during which time a fire and oil spill occurred allegedly damaging property at the Site and requiring clean-up, (*see, e.g., id.* at 109–114).

26. In its initial briefing, Belden demanded $792,534.54 from Pharaoh for breach of contract, which it claims represents the total amount invoiced ($1,673.073.61) less the $740,000 paid by Pharaoh in "partial payments" and the $185,188.91 received by Belden from the sale of scrap. (Doc. 98 at 15–16, ¶ 81.) As explained in greater detail *infra*, in its latest briefing, Belden claims $747,884.70 is owed by Pharaoh. (Doc. 101 at 3, 5.) In addition, Belden claims this was an open account and therefore argues it is also entitled to attorney fees. (Doc. 98 at 16–19, ¶¶ 82–92.)

27. Pharaoh denies Belden's time and materials claim, (*see, e.g.*, Doc. 93 at 26; Doc. 95 at 12), and argues Belden agreed to do the job for scrap collected, (Doc. 93 at 10, ¶ 29). It claims the $740,000 it paid to Belden were loans, not payments for services rendered (*id*. at 4, ¶ 8) and demands repayment of this amount (Doc. 54 at 8, ¶ 32). Pharaoh argues in the alternative that, even if the Court does not accept Pharaoh's contention that Belden agreed

to do the Work for scrap, there "was no price agreed to [for Belden's Work], and the court should supply a reasonable price. . ." for Belden's services. (Doc. 95 at 12.)

28. In addition, Pharaoh counterclaims against Belden arguing that since it is undisputed that Belden left the job before completing the Work, and "performed the tasks at hand in a significantly substandard manner[,]" (Doc. 54 at 7, ¶ 29), Pharaoh is entitled at least to "damages that were foreseeable at the time the contract was made[,]" (Doc. 93 at 18, ¶ 51, quoting La. Civ. Code art. 1996). Pharaoh claims that it was "forced to pay in excess of $1 million to other contractors to assist with the completion of the job, or more accurately, to complete the job Belden failed to complete and to remedy the mess Belden had made." (Doc. 54 at 7, ¶ 29.)[13]

29. Pharaoh's counterclaim also alleges that Belden breached the Letter Agreement and/or is liable for tort damages resulting from M. Belden reentering the Site "and directly caus[ing] a fire and explosion which led to significant damage to the site" and "increased costs." (PTO, Doc. 57 at 6–7; *see also* Doc. 54 at 7–9, ¶¶ 29–32 and prayer; Doc. 93 at 18–20, ¶¶ 50–57.)

30. In its counterclaim, Pharaoh claims total damages in the amount of "no less than $1,740,000" for recovery of amounts loaned and the breach of contract and sustained damages. (Doc. 54 at 9.)[14] Alternatively, it claims that, even if its negligence claim is

---

[13] Pharaoh's counterclaim demands "an aggregate amount of no less than $1,740,000" but does not particularize what damages flowed from what breach. (Doc. 54 at 9.)

[14] Pharaoh's counterclaim does not provide a specific dollar amount of damages it claims Belden caused from the fire and oil spill. (Doc. 54 at 8–9, ¶ 32 and prayer.) In briefing, Pharaoh claims that it "spent approximately $360,000 to remediate the mess at Bayou Sorrel, the fire and the oil spill." (Doc. 93 at 8, ¶ 21.) In briefing, Pharaoh also states, "[t]he federalization considerably complicated the cleanup and remediation efforts and Bolen testified that he lost opportunity of $3,000,000 because of the complications caused by Belden walking off the job." (Doc. 95 at 11, citing Doc. 92 at 78–79 and Defendant's Exhibit 5.)

prescribed, it is entitled to an offset in the amount of the damages it sustained to be applied against any amounts it may owe on Belden's contract claim. (Doc. 93 at 8.)

## II.    SUMMARY OF FACTUAL AND LEGAL ISSUES

31. The main factual and legal issues to be resolved are:

*A.* Was there a meeting of the minds regarding the terms of payment under the Oral Contract, and, if so, what were they?

*B.* Was the Oral Contract breached by one or both parties?

*C.* If the Oral Contract was breached, what are the damages owed for said breach?

*D.* Was there an open account, and is Belden entitled to attorney fees?

*E.* Did Belden breach the Letter Agreement?

*F.* Is Pharaoh entitled to tort damages from Belden for the damages resulting from the oil spill and fire at the Site after the Letter Agreement was entered into?

*G.* Is Pharaoh entitled to an offset or credit?

## III.    PROCEDURAL HISTORY

32. The original Petition for Damages in the instant matter was filed by Verret Shipyard, Inc. on September 23, 2015, in the 18th Judicial District Court for the Parish of Iberville against Belden under an alleged open account for payment of invoices generated in connection with Belden's use of two vessels/deck barges in performing its Bayou Sorrel Oil Field clean-up activities. Verret's claims against Belden were subsequently resolved. (*See* Doc. 1-4 at 14–16, 58.)

33. On June 7, 2016, while the matter was pending in Iberville Parish, Belden filed a third-party demand against Pharaoh alleging breach of contract and open account. (*See generally* Doc. 1-4.)

34. On August 11, 2016, Pharaoh filed its Answer, Affirmative Defenses[,] and Reconventional Demand to Third Party Demand in which it admitted an Oral Contract was entered into between Pharaoh and Belden but claimed that it did not agree to pay money on open account. (Doc. 1-4 at 39-44.) Furthermore, within the Reconventional Demand, Pharaoh alleged a breach of the Oral Contract and the Letter Agreement, that "approximately $700,000" in funds paid by Pharaoh constituted loans which were not repaid, that Belden had failed to return a barge to Pharaoh, that Belden entered the Bayou Sorrel Field without permission in breach of the Letter Agreement, that Belden conducted testing in a negligent manner causing an oil leak and fire, that Pharaoh incurred expenses remedying the oil discharge and fire which it claimed Belden caused, and that Belden stole approximately 500 barrels of oil and sold it without authority to do so. (*Id*.)

35. On January 28, 2022, SWEPI, which had been named as an additional defendant by Belden, removed the matter to the United States District Court for the Middle District of Louisiana.[15] (*See generally* Doc. 1-4).

36. On August 30, 2022, Belden filed its Second Supplemental, Amending, and Restated Petition for Breach of Contract, Open Account, and/or Unjust Enrichment, in which it restated its allegations in full against Pharaoh. (Doc. 26.)

37. On April 17, 2024, Pharaoh filed its Answer, Affirmative Defenses and Re-Assertion of Counterclaims to Second Supplemental, Amended[,] and Restated Petition for Breach of Contract, Open Account, and/or Unjust Enrichment (Doc. 54).

---

[15] On September 14, 2023, this Court ruled that Belden's claims against SWEPI LP could not proceed as alleged (Doc. 52), and on April 17, 2024, the Court dismissed Belden's claims against SWEPI LP with prejudice, (Doc. 53).

38. On July 8, 2024, a bench trial of the present matter was held, as Belden and Pharaoh had mutually agreed to waive trial by jury. At the conclusion of trial, the Court ordered the parties to file Proposed Findings of Fact and Conclusions of Law. (Doc. 88.)

## IV.   PARTIES' ARGUMENTS

### A.  *Summary of Belden's Arguments*

39. Belden claims that "[i]n approximately July of 2013[,]" Belden and Pharaoh entered into the Oral Contract for Belden to decommission the Site on a time and materials basis. (Doc. 98 at 2, ¶ 2, citing Doc. 91 at 52.)

40. Belden argues that specifically, Pharaoh verbally agreed to pay Belden on a "time and materials" basis which would be invoiced to Pharaoh monthly and which Pharaoh was required to pay "within 30 days of receipt of the invoices." (PTO, Doc. 57 at 2; Doc. 98 at 3, ¶ 6, citing Doc. 91 at 52, 59.) M. Belden testified that in the 35 years he had been in business, "[t]hat's how I've always done it." (Doc. 92 at 21.)

41. According to M. Belden, he reached the agreement with Pharaoh without a written contract because "I'm pretty much a man of my word. You know, I'm kind of old school. Kind of a handshake type deal, you know. . . . Verbal agreement is an agreement." (Doc. 92 at 10.)

42. Belden argues that it submitted its invoices "on a monthly basis to Pharaoh's foreman/project manager Elden Miller, who was often present at the Site during Belden's work there. (Doc. 98 at 3, ¶ 6; *see also* Doc. 91 at 59; Doc 92 at 19–21.) M. Belden wasn't sure if his wife also emailed the invoices. (Doc. 92 at 19.) Belden offered the invoices and supporting documents into evidence as Plaintiff's Exhibits 1A – 1L.

43. Belden claims that, in response to the invoices, "Pharaoh issued a series of partial payments. . . " but never paid Belden for the total amounts invoiced. (Doc. 98 at 3, ¶ 7; *see also* Doc. 92 at 23.)

44. Belden also acknowledges that Belden sold some scrap taken from the Site during the course of its Work and credited Pharaoh approximately $185,000 for the proceeds it received from the sale of scrap. (Doc. 98 at 12, ¶ 60, citing Doc. 92 at 110.) The precise amount received by Belden and credited to Pharaoh was $185,188.91. (Plaintiff's Exhibit 2-b at 434–436.)

45. In his trial testimony, M. Belden specifically denied Pharaoh's contention that he, M. Belden, "expressed [to Bolen] some problems with cash flow and asked [Bolen] if he could advance [Belden] some operating capital, with the understanding that this would be refunded or returned to Pharaoh at the completion of the job." (Doc. 92 at 23–24.)

46. Rather, M. Belden claims he had several telephone and in-person conversations at the Site with Bolen "about the fact that the invoices weren't being paid in full." (Doc. 92 at 24.)

47. According to Belden, "with mounting unpaid invoices, on June 6, 2014, Belden transmitted a letter to Pharaoh notifying it that it would be required for Pharaoh to pay the ensuing monthly invoices within 15 days and requesting that Pharaoh sign the letter to confirm the payment plan, which Gary Bolen, the principal owner of Pharaoh, never did sign." (Doc. 98 at 3, ¶ 8, citing Doc. 91 at 88–90; Plaintiff Exhibit 10 at 504.)

48. Therefore, argues Belden, on approximately July 15, 2014, "due to the outstanding balance and failure of Pharaoh to issue any additional payments," Belden "left the site." (Doc. 98 at 3, ¶ 9.)

49. Belden also claims that another deciding factor motivating its termination of the Work and its leaving the Site was that a $200,000 check issued by Pharaoh in partial payment of outstanding invoices "bounced." (Doc. 91 at 85.)

50. In summary, Belden claims that, in connection with its work at the Site, it "incurred fees and costs of $1,673,073.61, invoiced to Pharaoh on a monthly basis." (PTO, Doc. 57 at 2; *see also* Doc. 98 at 10, ¶ 57; Doc. 92 at 42.) Belden initially maintained that, after crediting Pharaoh with $185,188.91 that Belden received for scrap and $740,000 paid by Pharaoh for Belden's invoiced time and materials, Belden was still owed $792,534.54. (Doc. 98 at 15–16, ¶ 81; *see also id*. at 11, ¶ 61.)

51. However, in its most recent filing, Belden admitted to errors in its original calculations and now claims it is entitled to $747,884.70. (Doc. 101 at 3, 5.)

52. In order to resolve certain collateral issues, Belden claims that Pharaoh, through its counsel, sent Belden a "Letter Agreement" on November 25, 2014, "in which Pharaoh agreed to pay $200,000 to Belden in exchange for Belden agreeing not to interfere with the remaining cleanup work which needed to be done after Belden left the site." (Doc. 98 at 4, ¶ 13.)

53. Regarding Pharaoh's claim that it left the Site prematurely and without just cause, Belden responds that it left justifiably due to Pharaoh's failure to pay its invoices pursuant to the Oral Contract. (*Id.* at 3, ¶ 9, citing Doc. 92 at 34–35.)

54. Regarding Pharaoh's claim that Belden breached the terms of the Letter Agreement when M. Belden returned to the Site, Belden argues that M. Belden had permission to do so. M. Belden insists that, notwithstanding his commitment in the Letter Agreement not to reenter the Site, he sought and gained permission from Pharaoh's Gary Bolen to reenter the Site to do "what needed to be done" regarding Belden's work for a third party. (*Id.* at 5, ¶¶

16–17, citing, inter alia, Doc. 92 at 132; *see also* Doc. 91 at 103; Doc. 98 at 20, ¶ 94, citing Doc. 92 at 117, 132–133, 72–73.)

55. In any event, argues Belden, any damages caused by the fire and spill were not a foreseeable result of the alleged breach since the provision requiring M. Belden not to return to the Site was placed in the Letter Agreement for reasons unrelated to a possible negligence claim of the type asserted. (Doc. 98 at 14, ¶ 70; *id.* at 21–23, ¶¶ 99–107.)

56. Regarding Pharaoh's claim that it is entitled to tort damages flowing from Belden's negligence in starting a fire and oil spill, Belden responds that it wasn't negligent. While Belden admits that oil was discharged and a fire started in connection with its work for a third party, (*id.* at 6–7, ¶¶ 22–32; Doc. 91 at 110), it argues that neither the fire nor the spill was its fault, (Doc. 98 at 7, ¶ 30).

57. Regardless of any negligence on Belden's part, however, Belden maintains that any tort claim has prescribed. (*Id.* at 21, ¶ 98, citing Doc. 1-4 at 39–44.)

### B. *Summary of Pharaoh's Arguments*

58. According to Bolen, Pharaoh's initial offer to Belden was for Belden to perform the clean-up services in exchange for 50% of the "metal" and 100% of "everything else" – which included "electrical, the pumps, the motors, the tanks, the whole ball of wax." (Doc. 92 at 56–57.)

59. Bolen testified that Belden accepted that offer and worked at the Site in accordance with the 50/50 deal for "a couple of months, maybe three, maybe four[,]" but then M. Belden told Bolen "I can't make it on this." (*Id.* at 58; *see also* Doc. 93 at 2–3, ¶ 3.)

60. Bolen then upped the offer to 100% of "everything out there" and M. Belden "agreed to that." (Doc. 92 at 58; *see also* Doc. 93 at 3, ¶ 4), In other words, according to Bolen, Belden

agreed to do the Work in exchange for "the right to sell any and all scrap found in the field or removed from the field." (PTO, Doc. 57 at 6; *see also* Doc. 93 at 3, ¶ 4).

61. Pharaoh contends after accepting this second offer, this was the working agreement between the parties thereafter. (Doc. 93 at 3, ¶ 4; *see also* Doc. 92 at 58–59, 85; PTO, Doc. 57 at 6.)

62. Bolen testified that Pharaoh did not require a written agreement with Belden because "Martin [Belden] was a junkyard dog like me." (Doc. 92 at 59.)

63. Bolen "categorically denie[s] any offer or acceptance of an amended deal based on time and materials." (Doc. 93 at 3, ¶ 6, citing Doc. 92 at 79.)

64. Pharaoh points the Court to Belden's testimony that Belden never defined what "'time and materials' meant[,]" that this undefined offer was never explicitly accepted by Bolen on behalf of Pharaoh, and that the alleged offer came with no "restrictions or . . . limitations of what the price of the contract might be." (*Id.* at 3, ¶ 5.)

65. According to Pharaoh, the terms of the deal changed when "it became apparent that" Belden did not own the equipment necessary to do the job and Belden "was leasing much of the equipment and incurring significant costs outside the scope of the Oral Contract." (PTO, Doc. 57 at 6.) Therefore, "[i]n order to facilitate Belden's ability to complete [the] clean-up, Pharaoh made loans to Belden totaling in excess of $740,000." (*Id.*; *see also* Doc. 93 at 4, ¶ 8 ("These payments . . . were intended as advances to Belden upon his request to keep the job going until he could sell scrap from the Site.").)

66. Bolen testified that no loan agreement was signed, no terms of repayment were agreed to, no security was demanded or given, no documentation of any kind was generated and, in fact, Bolen insists that "[t]here wasn't a discussion about repay[ment][.]" (Doc. 92 at 103–

104.)[16] Furthermore, Bolen testified that he told Pharaoh's attorney "if Martin will finish, we'll forgive all this money." (Doc. 92 at 103.)

67. Pharaoh insists that M. Belden's testimony that these monies paid by Pharaoh were "'partial payments' in response to purported monthly invoices being sent to Pharaoh . . . is demonstrably incorrect." (Doc. 93 at 4, ¶ 8.) Bolen insists that he "[n]ever. Not one time" "talked to Belden . . . about completing the deal on time and materials." (Doc. 92 at 79.)

68. Regarding Belden's invoices, Bolen testified, "I never saw an invoice." (*Id.* at 62.) He did admit, however that "[t]here were some invoices that showed up real late in the game, but we were pretty sure that Martin made these invoices up and that his wife was pretty good." (*Id.*) According to Bolen, M. Belden "made the[ ] numbers up" that are in the invoices. (*Id.* at 109; *see also* Doc. 95 at 4–5 ("The Court should find that neither Belden nor the purported invoices are credible.").)

69. Pharaoh insists that the invoices issued by Belden were not proved (Doc. 93 at 10–14, ¶¶ 30–41) and cannot be proof of any agreement between the parties (*id.* at 14–20. ¶¶ 42–57; *see also id.* at 22–23, 2d ¶¶ 59–60.) [17] In summary, Pharaoh contends "the Court should conclude [that the] consideration for the Work was the proceeds Belden could generate from the scrap sales . . . [and] Belden failed to carry his burden under Louisiana law that this agreement was ever modified." (*Id.* at 10, ¶ 29.)

70. In the alternative, Pharaoh argues that there was no meeting of the minds regarding the Oral Contract and therefore the Court should supply a reasonable price. (*Id.* at 20–22, ¶¶

---

[16] However, as discussed *infra,* Bolen later testified that repayment was discussed, at least generally. (Doc. 92 at 60.)
[17] Pharaoh's brief mistakenly repeats the paragraph numbers for ¶¶ 58–62. The Court will refer to the repeated paragraphs as 2d ¶ 58 etc.

58–2d 58.) But for the reasons previously stated, the invoices cannot and should not be used "as the basis to supply a reasonable price." (*Id.* at 20–21, 2d ¶ 59.)

71. Pharaoh doesn't suggest a specific amount as to what it considers would be a "reasonable price." Rather it notes that it was able "to complete the other half of the work for about $360,000" and that "Pharaoh transferred $740,000 and Belden retained $185,188.91 to complete a job that Pharaoh was able to complete for approximately $360,000." (*Id.* at 22, 2d ¶ 58.) Thus, Belden's testimony that he completed half the work for $1,600,000 is unrealistic. (*Id.*)

72. In addition, because Belden breached the Oral Contract by failing to complete the Work it had agreed to do, leaving the Site prematurely and without good cause, and performing the work it did do in an unworkmanlike manner, Pharaoh asserts in counterclaim that it is entitled to foreseeable damages even if Belden breached the Contract in good faith. (Doc. 54 at 8, ¶ 31.) Because Belden "undisputabl[y]" left the Site before the Work was complete, Belden owes Pharaoh "the loss sustained by [Pharaoh] and the profit of which [it] has been deprived." (Doc. 93 at 18, ¶ 50, citing La. Civ. Code arts. 1994 and 1995.)

73. Pharaoh says, "Belden quit working and left the Site with the job half complete . . . around mid-2014." (*Id.* at 5, ¶ 11.) According to Bolen, approximately 40% of the Work had been completed when Belden left the Site. (Doc. 92 at 89, 96.)

74. In terms of the damages sustained from the Belden's alleged breach of contract, Pharaoh claims in its counterclaim that it was "forced to pay in excess of $1 million to other contractors to assist with completion of the job, or more accurately, to complete the job Belden failed to complete and to remedy the mess Belden had made." (Doc. 54 at 7, ¶ 29.) In the counterclaim, Pharaoh claims total damages in the amount of "no less than

$1,740,000" for recovery of amounts loaned and the breach of contract and sustained damages (*Id.* at 9.).[18] The Counterclaim also alleges entitlement to "$1 million caused by Belden's poor and incomplete workmanship." (*Id.* at 8, ¶ 31.) In the Pretrial Order, Pharaoh claims that "Belden's actions caused Pharaoh to have to pay in excess of $1 million to other contractors to assist with the completion of the clean-up, which Belden never saw to completion." (PTO, Doc. 57 at 7.) In his trial testimony Bolen testified that "we spent another four to five hundred thousand to finish the program." (Doc. 92 at 68.) In briefing, Pharaoh states, "The federalization considerably complicated the cleanup and remediation efforts and Bolen testified that he lost opportunity of $3,000,000 because of the complications caused by Belden walking off the job." (Doc. 95 at 11, citing Doc. 92 at 78–79 and Defendant's Exhibit 5.)

75. Pharaoh has also asserted a counterclaim against Belden for breach of the Letter Agreement and/or tort damages resulting from M. Belden reentering the Site "and directly caus[ing] a fire and explosion which led to significant damage to the site" and "increased costs." (PTO, Doc. 57 at 6–7; *see also* Doc. 54 at 7–9, ¶¶ 29–32 and prayer; Doc. 93 at 18–20, ¶¶ 50–57.)

76.  Regarding the November 2014 Letter Agreement reached between Pharaoh and Belden, it "prohibited Belden from returning to or interfering with the Work as defined in the agreement." (Doc. 93 at 7, ¶ 16.)

77. While Pharaoh's Bolen admits he subsequently gave permission for Belden to return to the Site on one occasion so that Belden could do work for a third party (Doc. 92 at 72–74; *id.*

---

[18] Pharaoh's Counterclaim does not provide a specific dollar amount of damages it claims Belden caused from the fire and oil spill. (Doc. 54 at 8–9, ¶ 32 and prayer.)

at 116–118, 132–133), Pharaoh argues that M. Belden returned "at least three different times." (Doc. 93 at 7, ¶ 18.)

78. "While Belden was on Site, arguably in violation of the Letter Agreement, a flow line test resulted in an oil spill and fire" for which Pharaoh seeks to hold Belden accountable. (*Id.* at 7–8, ¶ 19. *See also id.* at ¶¶ 20–24.)

79. Pharaoh argues that by returning to the Site in breach of the agreement and causing the oil spill and fire, Belden is liable for "foreseeable damages" under La. Civ. Code arts. 1994–1996. (Doc. 93 at 18, ¶¶ 50–52.)

80. According to Pharaoh, "Pharaoh spent approximately \$360,000 to remediate the mess at Bayou Sorrel, the fire and the oil spill." (*Id.* at 8, ¶ 21; *see also* Doc. 92 at 76–78 and Exhibits 8A – 8X.)[19]

81. Pharaoh maintains the damages from the spill and fire were foreseeable consequences of Belden's breach of the Letter Agreement. It contends that because Pharaoh was unaware that Belden would return on more than the one occasion he was given permission to do so, "anything Belden did" under these circumstances would be foreseeable and therefore "Belden should be responsible for all of the damages caused by the fire and spill." (Doc. 93 at 18–19, ¶ 52.)

82. Alternatively, Pharaoh claims that even if the Court finds that Pharaoh's tort claim for the fire and oil spill damage is prescribed, Pharaoh is still entitled to an offset for any damages that are "incidental to, or connected with, the obligation" Belden is seeking to enforce. (*Id.* at 19, ¶ 53–54, citing La. Civ. Code art. 424; *see also id.* at 8, ¶ 23.).)

---

[19] As is noted elsewhere, Pharaoh also claims that the \$360,000 was spent "ostensibly [to be] able to complete the other half of the work…" left incomplete after Belden left the Site. (Doc. 93 at 22, ¶ 58, no record citation.)

83. And even if the Letter Agreement wasn't breached, Pharaoh maintains that it is still entitled to an offset "based on Belden's abandonment of the Work then negligence at the Site" which, argues Pharaoh, "cost Pharaoh money as well as the opportunity for millions of dollars from Shell." (*Id.* at 20, ¶ 57.)

## V.     DISCUSSION

### A. *Facts*

84. The Court notes at the outset that the abysmal failure of either party to document critical aspects of this multi-million dollar agreement has made the job of piecing together what actually happened extremely difficult. Each side's version of events has some holes and inconsistencies. However, after carefully reviewing the testimony and record evidence, the Court finds that Belden's version is the most credible and consistent with the evidence as a whole. On the other hand, the Court finds Bolen's testimony is internally inconsistent, lacks credibility, and defies common sense.

85. Before Belden entered into the Oral Contract with Pharaoh, it was doing work at the Site for one of Pharaoh's contractors, Dickie LeBlanc. (Doc. 92 at 4; Doc. 91 at 26–29.) Belden was not working directly for Pharaoh at that time but "through [Dickie] LeBlanc." (Doc. 91 at 28–29.) According to M. Belden, it was on the outlying wells. (*Id.* at 27.)

86. After Pharaoh had some problems with Dickie LeBlanc, Pharaoh's foreman Elden Miller asked M. Belden whether his company would be interested in "continuing the work that Dickie LeBlanc had started." (*Id.* at 28.) It is unclear from the record when Dickie LeBlanc began and ended his work at the Site and when Belden took over for Dickie LeBlanc.

87. According to M. Belden, the work Dickie LeBlanc had been performing which Belden agreed to complete involved "pull[ing] the cribbings and pilings and all the wooden

21

structures and piping back to the bank" on some "20 to 30 well sites out there." (Doc. 92 at 6.) Belden was to leave the cement platforms there. (*Id.* at 7.) Belden was to remove the "functioning equipment[,] like pumps [and] generators. . . ." (Doc. 92 at 7.) Most of those wells had already been plugged and abandoned. (Doc. 91 at 27.)

88.  M. Belden testified that, "when we were almost finished [removing the pilings and cribbings,] Elden Miller approached me and said that his boss, Gary Bolen, would like to talk to me about continuing work out there decommissioning that facility if I was interested in it." (*Id.* at 30.)

89.  Belden maintains that the $50,000 paid to Belden by Pharaoh on August 14, 2013, "was specifically for the distinguishable work" of completing Dickie LeBlanc's job which Belden had inherited before reaching its separate agreement to work directly for Pharaoh. (Doc. 99 at 3–4, citing Doc. 91 at 31.) The Court finds M. Belden's testimony on this point is credible and supported by the sequencing of the work done to complete Dickie LeBlanc's work followed by the work begun directly for Pharaoh.

90.  A couple of weeks later, according to M. Belden, when Belden was finishing up on the removal of the wellhead structuring, he and Bolen did a "gradual walk-around" and Bolen said, "a man could make a lot of money with scrapping this." (Doc. 91 at 46.) According to M. Belden, Bolen offered him a "50/50 deal" for the decommissioning work, i.e., "[Bolen] and I would split the scrap cost 50/50 . . . [and] [w]hatever we got for the scrap we would split it 50/50." (*Id.* at 46; *see also* Doc. 92 at 8.) This occurred in June or July of 2013. (Doc. 91 at 52.)

91.  According to M. Belden, he declined Bolen's offer because it would have "cost me too much to take [the scrap] out and there wasn't enough steel and metal there." (Doc. 92 at 8;

*see also* Doc. 91 at 47 ("There was too much labor to be done there - - too much work to be done to profit any money to make anything off of it.").)

92. Bolen then asked M. Belden if his company would do the job for 100% of the scrap. (Doc. 92 at 9.) M. Belden did not immediately respond and worked on the job for about a week before rejecting that proposal. (*Id.*)

93. After rejecting the second Bolen proposal, M. Belden claims that he told Bolen, "I can do a time and materials job for you." (Doc. 91 at 48.) Belden admitted that there was no detailed discussion regarding the number of people who would be hired, whether the equipment would be Belden's, hired from a third party, or both. (Doc. 92 at 16–17.) "I can't say I defined it. [I] kind of gave him an overview of what I thought it was going to take to do the job, you know." (*Id.*)

94. According to M. Belden, Bolen accepted, saying, "[t]he Department of Natural Resources is on me. I've got to get it done. Can you see what it takes to get it done." (Doc. 91 at 48.) But while M. Belden testified Bolen agreed to Belden doing the work on a time and materials basis, he later testified that Bolen "never really gave [him] a straight answer" as to whether "a time and materials basis was acceptable." (Doc. 92 at 17.)

95. M. Belden claims that this agreement was made within a week or two of beginning work on the project, and it was done in a telephone conversation. (*Id.* at 16.)

96. M. Belden's position is that the two companies had a verbal agreement despite his admission that Bolen never affirmatively agreed to it because M. Belden explained to Bolen that "that's . . . the only way I could do the job" and Bolen responded that "'the DNR was pressuring him to do the job, so do what it takes to get the job done.'" (*Id.* at 17.)

97. Furthermore, according to M. Belden, Bolen agreed to this arrangement on behalf of Pharaoh because "[n]o negativity" was expressed by Bolen. (*Id.* at 18.)

98. Thus, Belden argues that Pharaoh verbally agreed to pay Belden on a "time and materials" basis which would be invoiced to Pharaoh monthly. (Doc. 98 at 3, ¶ 6; *see also id.* at 9–10, ¶¶ 42, 44.) "According to the [Oral Contract], Pharaoh was required to pay Belden within 30 days of receipt of the invoices." (PTO, Doc. 57 at 2; *see also* Doc. 98 at 3, ¶ 6.)

99. According to M. Belden, he reached the agreement with Pharaoh without a written contract because "I'm pretty much a man of my word. You know, I'm kind of old school, kind of a handshake type deal, you know. . . . Verbal agreement is an agreement." (Doc. 92 at 10.)

100.    In his testimony, M. Belden detailed how his time and materials billing worked to profit Belden, i.e., by way of the rental of Belden's equipment and M. Belden's daily rate for overseeing the project. (*See* Doc. 92 at 12–14.)

101.    Belden contends in briefing that it started work on the project "[b]eginning in August of 2013." (Doc. 98 at 2, ¶ 4.) M. Belden agreed at trial it was "in the middle of August[.]" (Doc. 91 at 57.)

102.    Belden argues that it submitted its invoices "on a monthly basis to Pharaoh's foreman/project manager Elden Miller, who was often present at the [S]ite during Belden's" work there. (Doc. 98 at 3, ¶ 6; *see also* Doc. 91 at 59; Doc 92 at 19 *et seq.*)

103.    According to Belden, "Pharaoh issued a series of partial payments . . ." in response to the invoices but never paid Belden for the total amounts invoiced. (Doc. 98 at 3, ¶ 7; *see also* Doc. 92 at 23.)

104.    M. Belden explained that the amounts he received from Pharaoh did not match his invoices because "that['s] the way that that worked, as they progressed with the job, they

24

was going to get a draft for the money that they had the kitty for to do the cleanup as it progressed so far he would pay me as we went." (Doc. 91 at 61.) He testified that the invoices were sequential in number because that was the only job Belden had at the time. (*Id.* at 71.)

105.     M. Belden also acknowledged that Belden sold some scrap taken from the Site during the course of its Work and credited Pharaoh's account with the proceeds it received from the sale of scrap. (*Id.* at 65–69; Doc. 98 at 12, ¶ 60.) The amount received and credited was $185,188.91." (Plaintiff's Exhibit 3 at 449; *see also* Doc. 93 at 3, ¶ 4.)

106.     In his trial testimony, M. Belden specifically denied Pharaoh's contention that he, M. Belden, "expressed [to Bolen] some problems with cash flow and asked [Bolen] if he could advance . . . some operating capital, with the understanding that this would be refunded or returned to Pharaoh at the completion of the job." (Doc. 92 at 23–24.)

107.     Rather, according to M. Belden, he had several telephone and in-person conversations at the Site with Bolen "about the fact that the invoices weren't getting paid in full." (*Id.* at 24.)

108.     In February of 2014, Bolen changed Belden's scope of the work to be done. (Doc. 91 at 76–77.) Belden was directed to start "pigging" and "flushing" the oil lines at the Site. (*Id.*) However, according to Belden, the time and materials billing arrangement remained the same. (*Id.* at 77.)

109.     According to Belden, "with mounting unpaid invoices, on June 6, 2014, Belden transmitted a letter to Pharaoh notifying it that it would be required for Pharaoh to pay the ensuing monthly invoices within 15 days and requesting that Pharaoh sign the letter to

confirm the payment plan, which Gary Bolen, the principal owner of Pharoah, never did sign." (Doc. 98 at 3, ¶ 8, citing Doc. 91 at 88–90; Plaintiff's Exhibit 10 at 504).

110.     M. Belden testified that in the June/July 2014 time frame, Bolen agreed to "catch up" on his late payments and Belden initially continued to work based on this assurance. (Doc. 91 at 84–85.)

111.     On July 18, 2014, Pharoah wrote a check to Belden for $200,000 (Defendant's Exhibit 4) but the partial payment check "bounced." (Doc. 98 at 4, ¶ 12; Doc. 91 at 85.) M. Belden clarified that when he attempted to deposit the check, his bank refused to honor it after which M. Belden hired an attorney. (Doc. 91 at 88.) In the Letter Agreement signed by both parties, this check was described as "a Bolen personal check delivered to Belden returned 'NSF'[.]" (Defendant's Exhibit 7 at PHA 33.)

112.     M. Belden testified that in an effort to persuade Belden to return to Work at the Site, Bolen said, "let's have a meeting," and they met at the Site. (Doc. 91 at 87.)

113.     According to Belden, "[Bolen] said if [Belden] left the job he was going to cancel payment on the check. [Belden] said well, I can't afford to stay here anymore. This is all coming out of my pocket. I'm financing your cleanup. I'm not going to do that. I'm leaving. So I pulled off the job." (Doc. 91 at 85.)

114.     Therefore, maintains Belden, "due to the outstanding balance and failure of Pharoah to issue any additional payments," Belden "left the site" in mid-July. (Doc. 98 at 3, ¶ 9.)

115.     Following the departure, the parties attempted to reconcile their differences.

116.     First, on or about August 1, 2014, Pharoah, through its attorneys, sent a "Completion Agreement" to M. Belden wherein Pharoah offered to pay $1,200,000 within 30 days of the State's final approval of the Work and another $100,000 bonus if the job was

completed within 90 days of the agreement. (Defendant's Exhibit 6; Doc. 91 at 87–88; Doc. 92 at 32–33.) Although Bolen signed the agreement, Belden refused to do so. (Doc. 91 at 88; Defense Exhibit 6 at PHA 32.)

117.    Then, on or about November 11, 2014, Belden proposed a compromise wherein Pharaoh would pay Belden up to $1,200,000 when the job was completed with credit to be given against the retainer for the amount of any scrap sold from the job. (Plaintiff's Exhibit 7; Doc. 92 at 26–32.) This offer was refused by Pharaoh and the document was not signed by either party. (Doc. 92 at 31–32.)

118.    Finally, in order to resolve the issue of the NSF check and other collateral issues, the parties entered into a "Letter Agreement" on November 25, 2014, in which Pharaoh agreed, among other things, to pay $200,000 to Belden, and Belden agreed not to interfere with the remaining cleanup work which needed to be done after Belden left the site. (Doc. 98 at 4, ¶ 13; Plaintiff's Exhibit 12; Defendant's Exhibit 7; Doc. 92 at 25.)

119.    In summary, Belden initially claimed that, in connection with its work on the site, it "incurred fees and costs of $1,673,073.61, invoiced to Pharaoh on a monthly basis." (PTO, Doc. 57 at 2; *see also* Doc. 98 at 12, ¶¶ 57–61; Doc. 92 at 42.) After crediting Pharaoh with $185,188.91 that Belden received for scrap, (Doc. 98 at 11, ¶ 60), and $740,000 paid by Pharaoh for Belden's invoiced time and materials, Belden claimed it was still owed $792,534.54, (*id.* at 15–16, ¶ 81; *see also id.* at 12, ¶ 61).[20]

120.    As mentioned earlier, Belden submitted corrected calculations and now demands $747,884.70. (Doc. 101 at 3, 5.) These new calculations will be discussed in more detail in the Discussion section of this ruling.

---

[20] In the Pretrial Order, Belden claims a slightly different figure: $792,530.54. (Doc 57 at 4.)

121.        In addition, Belden argues that the time and materials invoice arrangement was an

open account and therefore Belden is entitled to recover reasonable attorneys' fees in

addition to the principal amount owed. (Doc 98 at 16–19, ¶¶ 82–92.)

122.        Belden claims that after he left the Site and entered into the letter agreement, Belden

was hired by a third party to provide services at the site unrelated to the cleanup. (*Id.* at 5–

7, ¶¶ 15–32.)

123.        Belden insists that, notwithstanding his commitment in the Letter Agreement not to

reenter the Site, he sought and gained permission from Pharaoh's Bolen to reenter the Site

and to do "what needed to be done" regarding that work for the third party. (*Id.* at 5, ¶¶ 16–

17; Doc. 91 at 103.)

124.        Belden admits that oil was discharged and a fire started in connection with its work

for the third party, (Doc. 98 at 6–7, ¶¶ 22–32; Doc. 91 at 110), but argues that neither was

its fault, (Doc. 98 at 7, ¶ 30). Belden was sued by Interstate Oil and Gas and the Coast

Guard over the fire and oil spill and the suit was "resolved". (Doc. 91 at 114.)

## B.  *Standard*

### 1.        **Breach of Contract Generally**

125.        "A contract is an agreement by two or more parties whereby obligations are created,

modified, or extinguished." La. Civ. Code art. 1906. "In Louisiana, a breach-of-contract

claim has three 'essential' elements: '(1) the obligor's undertaking an obligation to perform,

(2) the obligor failed to perform the obligation (the breach), and (3) the failure to perform

resulted in damages to the obligee.'" *Guillory v. Carrington Mortg. Servs., LLC*, No. 22-

192, 2024 WL 1020555, at *9 (M.D. La. Mar. 8, 2024) (deGravelles, J.) (quoting

*IberiaBank v. Broussard*, 907 F.3d 826, 835 (5th Cir. 2018) (quoting *Favrot v. Favrot*, 2010-

986 (La. App. 4 Cir. 2/9/11), 68 So. 3d 1099, 1108–09)). "The first two elements of a breach-of-contract claim, obligation and breach, 'involve[ ] issues of both contractual interpretation as a matter of law, as well as questions of fact regarding whether the actions of the parties actually constituted the alleged breach under the applicable contractual terms.'" *Id.* (quoting *IberiaBank*, 907 F.3d at 835 (citing *Mobil Expl. & Producing U.S. Inc. v. Certain Underwriters Subscribing to Cover Note 95-3317(A)*, 2001-2219 (La. App. 1 Cir. 11/20/02), 837 So. 2d 11, 26)).

### 2.    Oral Contracts and Their Interpretation

126.     As regards the Oral Contract between Belden and Pharaoh, the following general rules prevail.

127.     "[I]f a contract's value 'is in excess of five hundred dollars,' the existence of an oral contract 'must be proved by at least one witness and other corroborating circumstances.'" *Payne v. Forest River, Inc.*, No. 13-679, 2015 WL 7013506, at *6 (M.D. La. Nov. 12, 2015) (deGravelles, J.) (quoting La. Civ. Code art. 1846; and then citing *Samuels v. Firestone Tire & Rubber Co.*, 342 So. 2d 661, 662 (La. 1977) (quoting Art. 1846)).

128.     "'[T]he party who is demanding performance of an obligation must prove the existence of the obligation' by a preponderance of the evidence." *Id.* (quoting La. Civ. Code art. 1831; and then citing *Kilpatrick v. Kilpatrick*, 27,241 (La. App. 2 Cir. 8/23/95), 660 So. 2d 182, 185)).

129.     "[A] plaintiff himself or herself may serve as a witness, but the 'other circumstances [that] corroborate the claim must come from a source other than the plaintiff.'" *Id.* (quoting *Suire v. Lafayette City-Parish Consol. Gov't*, 04-1459 (La. 4/12/05); 907 So. 2d 37, 58).

130.     "Still, such 'corroborating circumstances need only be general in nature; independent proof of every detail of the agreement is not required.'" *Id.* (quoting *Suire*, 907 So. 2d at 58 (relying on *Kilpatrick*)).

131.     "Interpretation of a contract is the determination of the common intent of the parties." La. Civ. Code art. 2045; *see also Mumblow v. Monroe Broad., Inc.*, 401 F.3d 616, 621 (5th Cir. 2005) (explaining that, under Louisiana law, courts "look to the parties' intent to determine the terms of an oral agreement . . ." (citing, inter alia, La. Civ. Code art. 2045)).

132.     "[W]hen an enforceable oral contract is perfected between the parties, but they disagree on its terms, writings between the parties may be relevant in discerning the terms of the oral contract." *Trahan v. Scott Equip. Co.*, 493 F. App'x 571, 574 (5th Cir. 2012).

### 3.     Interpretation of Written Contracts

133.     The Letter Agreement entered into between Belden and Pharaoh was in writing and therefore the following law, taken from *Guillory*, 2024 WL 1020555, at *10, applies.

134.     "When a contract is unambiguous, [courts] look only to the four corners of the contract to interpret it." *Brock Servs., L.L.C. v. Rogillio*, 936 F.3d 290, 298 (5th Cir. 2019) (citing La. Civ. Code art. 2046). "A contract is ambiguous, however, 'when it is uncertain as to the parties' intentions and susceptible to more than one reasonable meaning under the circumstances and after applying established rules of construction.'" *Guidry v. Am. Pub. Life Ins. Co.*, 512 F.3d 177, 181 (5th Cir. 2007) (quoting *Lloyds of London v. Transcon. Gas Pipe Line Corp.*, 101 F.3d 425, 429 (5th Cir. 1996)).

135.     "[W]hen the terms of a written agreement are susceptible to more than one interpretation, or there is uncertainty or ambiguity as to its provisions, or the intent of the parties cannot be ascertained from the language employed, parol evidence is admissible to

clarify the ambiguity or to show the intention of the parties." *Brock Servs.*, 936 F.3d at 298

(quoting *Condrey v. SunTrust Bank of Ga.*, 429 F.3d 556, 563 (5th Cir. 2005)). *See also*

*Scafidi v. Johnson*, 420 So. 2d 1113, 1115 (La. 1982) ("Between the parties to an

instrument, parol evidence is admissible . . . to explain an ambiguity when such explanation

is not inconsistent with the written terms. . . ." (quotation omitted) (cited with approval by

*Brock Servs.*)).

136.    "A doubtful provision must be interpreted 'in light of the nature of the contract,

equity, usages, the conduct of the parties before and after the formation of the contract, and

of other contracts of a like nature between the same parties.'" *Greenwood 950, L.L.C. v.*

*Chesapeake La., L.P.*, 683 F.3d 666, 669 (5th Cir. 2012) (quoting La. Civ. Code art. 2053).

"According to the Civil Code, *equity* 'is based on the principles that no one is allowed to

take unfair advantage of another and that no one is allowed to enrich himself unjustly at

the expense of another,' and *usage* is 'a practice regularly observed in affairs of a nature

identical or similar to the object of a contract subject to interpretation.'" *Id.* at 669 n.13

(quoting La. Civ. Code art. 2055).

137.    Additionally, "[n]ontechnical words in a contract must be given their generally

prevailing meaning, and each contract provision must be interpreted in light of the other

provisions so that each is given the meaning suggested by the contract as a whole." *Id.* at

669 (citing La. Civ. Code arts. 2047, 2050).

138.    "If an ambiguity remains after applying the other general rules of construction, then

the ambiguous contractual provision is to be construed against the drafter." *Brock Servs.*,

936 F.3d at 298 (quoting *Chinook USA, L.L.C. v. Duck Commander, Inc.*, 721 F. App'x 361,

366 (5th Cir. 2018) (citing La. Civ. Code art. 2056 ("In case of doubt *that cannot otherwise*

*be resolved*, a provision in a contract must be interpreted against the party who furnished its text." (emphasis added by *Brock Servs.*)))).

### 4.   Damages for Breach of Contract

139.     "An obligor is liable for the damages caused by his failure to perform a conventional obligation." La. Civ. Code art. 1994. "A failure to perform results from nonperformance, defective performance, or delay in performance." *Id.*

140.     "Damages are measured by the loss sustained by the obligee and the profit of which he has been deprived." *Id.* art. 1995.

*141.*     "Damages for delay in the performance of an obligation are owed from the time the obligor is put in default." *Id.* art. 1989. "Other damages are owed from the time the obligor has failed to perform." *Id.*

142.     "When a term for the performance of an obligation is either fixed, or is clearly determinable by the circumstances, the obligor is put in default by the mere arrival of that term. In other cases, the obligor must be put in default by the obligee, but not before performance is due." *Id.* art. 1990.

143.     "An obligee may put the obligor in default by a written request of performance, or by an oral request of performance made before two witnesses, or by filing suit for performance, or by a specific provision of the contract." *Id.* art. 1991.

144.     "When the object of the performance is a sum of money, damages for delay in performance are measured by the interest on that sum from the time it is due, at the rate agreed by the parties or, in the absence of agreement, at the rate of legal interest as fixed by R.S. 9:3500." *Id.* art. 2000.

### 5.    Open Accounts

145.    Belden argues that its Oral Contract with Pharaoh was an open account. (Doc. 98 at 16–19, ¶¶ 82–92.) "When any person fails to pay an open account within thirty days after the claimant sends written demand therefor correctly setting forth the amount owed, that person shall be liable to the claimant for reasonable attorney fees for the prosecution and collection of such claim when judgment on the claim is rendered in favor of the claimant." La. Rev. Stat. § 9:2781(A).

146.    "For the purposes of this Section . . ., 'open account' includes any account for which a part or all of the balance is past due, whether or not the account reflects one or more transactions and whether or not at the time of contracting the parties expected future transactions." *Id.* § 9:2781(D). "'Open account' shall include debts incurred for professional services . . . ." *Id.*

### C.  *Analysis*

147.    The Court now resolves the following factual and legal issues raised in this case.

    *A.*  Was there a meeting of the minds regarding the terms of payment under the Oral Contract, and, if so, what were the terms?

    *B.*  Was the Oral Contract breached by one or both parties?

    *C.*  If the Oral Contract was breached, what are the damages owed for said breach?

    *D.*  Was there an open account, and is Belden entitled to attorney fees?

    *E.*  Did Belden breach the Letter Agreement?

    *F.*  Is Pharaoh entitled to tort damages from Belden for the damages resulting from the oil spill and fire at the Site after the Letter Agreement was entered into?

    *G.*  Is Pharaoh entitled to an offset or credit?

**1. Was there a meeting of the minds regarding the terms of payment under the Oral Contract, and, if so, what were the terms?**

148.     Both parties agree that an Oral Contract existed between Pharaoh and Belden wherein Belden was to perform the Work to decommission the Site. (PTO, Doc. 57 at 7–8, Established Fact.)  They disagree on how Belden was to be paid. As detailed above, Belden argues the Work was to be done on a time and materials basis per invoice. It argues that the $740,000 paid by Pharaoh were partial payments for the time and materials invoiced.

149.     Pharaoh argues that the Work was to be done in exchange for the scrap Belden could collect and sell but later the agreement was amended such that Pharaoh would also lend money to Belden for work and materials subject to being repaid at the end of the job.

150.     Pharaoh argues in the alternative that should the Court reject its position that Belden agreed to do the Work for scrap and that the monies it paid to Belden were loans, then there was no meeting of the minds between the parties and the Court should a) set a reasonable price for the services performed by Belden and b) give it an offset for any amounts it paid to Belden.

151.     The Court repeats: it is astounding that this contact involving the expenditure of millions of dollars by both parties and untold hours of work was not reduced to writing. Bolen claimed he didn't reduce the agreement to writing because M. Belden was a "junkyard dog like me." (Doc. 92 at 59.) M. Belden said he did the "handshake . . . deal" because he is a "man of [his] word[,] . . . kind of old school . . . ." (*Id.* at 10.) This colossal failure of good business practice and common sense on both sides led to an extensive pre-lawsuit dispute, eventually this lawsuit, and undoubtedly the payment of significant sums by both sides in attorney fees.

152.     Regarding the key issue of terms of payment, the Court recognizes that there is directly conflicting testimony by the principals, M. Belden and Bolen, and conflicting evidence tending to support and contradict the parties' respective positions. The Court has carefully reviewed the conflicting evidence and based on the Court's assessment of the credibility of the principal witnesses, the totality of the record, and by a preponderance of the evidence, the Court rejects Pharaoh's position and Bolen's testimony that Belden agreed to do the work for the scrap and that the $740,000 Pharaoh paid to Belden were loans. The Court finds that Bolen's testimony lacked credibility in a number of significant ways (some of which are detailed below), was inconsistent with other evidence, and was internally inconsistent and unbelievable. This testimony will be reviewed in more detail *infra*.

153.     First and foremost, Pharaoh's position hinges on the Court accepting its contention that it loaned nearly three quarters of a million dollars to a literal "mom and pop" business without a writing, definite terms of repayment, or security. When asked by his lawyer why he didn't get a written contract nailing down how Belden was to be paid, Bolen responded unbelievably, because "Martin was a junkyard dog like me." (Doc. 92 at 59.)

154.     Bolen claims, incredibly, that during the Work, he never talked with Belden about money at all. "[M. Belden is] saying he kept talking to me about money. He never talked to me about money. And I wouldn't have talked to him about money, because I don't do that." (*Id.* at 68.)

155.     Bolen's testimony about whether they ever even talked about repayment of the "loans" is self-contradictory. In one part of his cross examination, he was adamant that "we didn't talk about repayment" of the $740,000 "loan." (*Id.* at 103; *see also id.* at 104: "Q:

So just to confirm, there was never a discussion about repayment? A. No, there wasn't a discussion about repaying this money.")

156.     But, contradicting his other testimony, Bolen testified he did talk to M. Belden about money and repayment. "What we did is when [M. Belden] called me and [ ] said he needed some money, I said, 'Fine.' He's the one that said to me, 'I will pay this back to you if you'll just help me out.' That's what he said." (*Id.* at 98.)

157.     But even in this version, Bolen got no commitment from Belden about the specifics of repayment or whether interest would be charged, testifying that M. Belden said: "If you'll give me some money, then after we finish, we'll get this - - we'll take care of this." (Doc. 92 at 103.)

158.     Indeed, in another part of his testimony, Bolen seems to blame his lawyer for sending the money to Belden. "And so Mike Crawford [Pharaoh's attorney] was the one feeding [M. Belden] some money, you know, but it was always a hundred thousand or two hundred or fifty thousand." (*Id.* at 68.)

159.     Bolen gave yet a third version of his discussion with Belden regarding the "loans":

> [M.] Belden called me up on the phone and said that he needed some funds to keep the program going, that he was in a bind, and I said, "Well, how much do you need?" And he told me, and I said, "Okay. I'll send it to you, but how are we going to make arrangements on this?"
> He said, "Oh, don't worry about it. When we get to the end of it, we'll have extra money and I'll pay you back." . . . So it started getting kind of drastic out there. And I would send him 50,000, a hundred thousand. I never saw any invoice ever. Ever."

(*Id.* at 60.)

160.     Elsewhere in his testimony, Bolen testified (again, incredibly) that he planned to forgive the "loans" altogether at the end of the Work. According to Bolen's sworn

testimony, he told Pharaoh's attorney "if [M. Belden] will finish, we're going to forgive all this money." (*Id.* at 103.) All of this makes no sense and is rejected by the Court.

161.    Bolen contends that M. Belden agreed to the deal to take 100% of the scrap to do the Work and testified they "shook hands" on it. (Doc. 92 at 57–58.) Bolen testified that his foreman Elden Miller saw them "shake hands" on that (*Id.*) and yet, although Miller was called in Pharaoh's case, Miller was not asked whether he saw them shake hands to confirm the deal and, indeed, testified that he "[didn't] know the details of the agreement." (*Id.* at 139.)

162.    Bolen claims he wanted Belden to do the work for the scrap at the Site which, according to Bolen, was worth "over a million and a half to two million dollars" in piping alone. (*Id.* at 55.) Yet for reasons which defy logic, Bolen would not give Belden a copy of a survey Pharaoh had done valuing the scrap. (*Id.* at 82.) Bolen's explanation was, "[w]ell, if he [M. Belden] was going to make a deal, he should have figured it out. . . ." (*Id.* at 82–83.) Nor was the survey introduced in evidence.

163.    In support of Belden's position that Pharaoh agreed to pay for its Work on a time and materials basis, M. Belden testified that he submitted Belden's invoices "on a monthly basis to Pharaoh's foreman/project manager Elden Miller, who was often present at the [S]ite during Belden's" Work there. (Doc. 98 at 3, ¶ 6; *see also* Doc. 91 at 59; Doc 92 at 19 *et seq.*)

164.    Elden Miller's testimony on this issue was uncertain and equivocal at best. In response to questioning by Pharaoh's counsel, he said that he remembered getting an email with "several [invoices] listed" but that he "did not open them up." (Doc. 92 at 145; *see also id.* at 146 ("I don't recall that I even opened it up.").)

165.     Miller testified he did not receive monthly invoices. (*Id.* at 145.) But when questioned by the Court as to whether he had received more than one invoice individually, he testified that he "would have to go back - - it's been over ten years - - to try to look at the emails if I need to . . ." and admitted "I'm not sure." (*Id.* at 147.)

166.     Bolen's testimony about the invoices is again, inconsistent, self-contradictory, and nonsensical. Bolen testified, "I never saw an invoice." (*Id.* at 62.)[21] However, he later testified that "[t]here were some invoices that showed up real late in the game, but we were pretty sure that [M. Belden] made these invoices up and that his wife was pretty good." (*Id.* at 62.) According to Bolen, M. Belden "made the numbers up" that are in the invoices. (*Id.* at 109).[22]

167.     But when Bolen did get the "made up" invoices, he didn't call M. Belden and demand an explanation of why he was being invoiced at all, let alone why he was receiving "made up" invoices. When asked "Did you . . . call [M. Belden] and say[,] 'Martin, what are these invoices?', Bolen stated, "No, because I'm not a micromanager. And I figured, if he's going to do something like that, then that's his problem." (Doc. 92 at 93.)

168.     Strangely however, Bolen also testified that, had Belden's invoice been accurate, he would have paid it. "Martin made those invoices up. I don't have a signed contract with him. I never signed an invoice with him. *If that invoice would have been right, I would have signed it and paid it.*" (*Id.* at 99) (emphasis added.) This testimony is irreconcilable with his position that he never agreed to pay time and materials per invoice and that the invoices were "made up."

---

[21] If you believe both Bolen and Miller, no one at Pharaoh ever looked at the invoices. *See* Miller's testimony that he received the invoices by email but never "opened them up." (Doc. 92 at 145–146.)

[22] The Court also notes that while the invoices with supporting documentation were introduced without objection as Plaintiff's Exhibits 1A through 1L, these were not challenged in any meaningful way.

169.    Furthermore, Bolen's testimony that "a whole pile of [the invoices] come [sic] in at one time" is undercut by his admission that he wasn't "sure about that." (*Id.* at 135.)

170.    Pharaoh seeks to cast doubt on Belden's position that the parties agreed to an invoiced time and materials payment plan by arguing that "[t]he invoices are curiously sequentially ordered." (Doc. 93 at 9, ¶ 26.) Belden responds persuasively that this is not curious at all since this was the only job Belden had at the time. (Doc. 91 at 71 ("I could just do one job at a time."); *see also* Doc. 92 at 22 ("That was the only job I had going on at that time.").) Belden's testimony in this regard is supported by his testimony that his company was small, that it was "just me and my wife really" and that he used contract laborers. (Doc. 91 at 26.)

171.    Pharaoh argues that Belden's position regarding time and materials is refuted because "by September 6, 2013, Belden had received $100,000 from Bolen" which was more than the "$86,947.53 which was the only invoice that would have existed at that time." (Doc. 93 at 4, ¶ 9; *see also* Doc. 95 at 2.) But Belden convincingly responds that "the $50,000 payment on August 14, 2013 prior to the generation of invoices . . . was specifically for the distinguishable work which remained to be done by Belden related to wellheads and cribbing after Dickie LeBlanc left the Bayou Sorrel Field." (Doc. 99 at 3–4, citing Doc. 91 at 29, 31, M. Belden Testimony.)

172.    Pharaoh argues that Belden's position is undermined by the fact that the amounts of the Pharaoh payments does not correspond to the amounts on the invoices. (Doc. 93 at 4–5, ¶ 9.) However, the Court accepts M. Belden's explanation that Bolen explained that "that['s] the way that . . . worked, as they progressed through the job, they was going to get

a draft for the money they had the kitty for to do the cleanup and as it progressed so far he would pay me as we went." (Doc. 91 at 61.)

173.    In sum, the Court finds that, based on its assessment of the credibility of the witnesses, the record as a whole, and by a preponderance of the evidence, contrary to Pharaoh's position and Bolen's testimony, Belden did not agree to do the Work for the value of the scrap.

174.    The next question is whether the parties agreed that Belden would be compensated on a time and materials basis. Here, again, the Court accepts M. Belden's testimony and finds that there was a sufficient agreement regarding Belden's proposal to do the work for time and materials to constitute a binding contract.

175.    Both Belden and Pharaoh agree that M. Belden declined Pharaoh's initial offer of 50% of the scrap. (Belden Testimony: Doc. 91 at 47 and Doc. 92 at 8; Bolen Testimony: Doc. 92 at 58.)

176.    Both M. Belden and Bolen testified that Bolen then asked M. Belden if his company would do the job for 100% of the scrap. (Doc. 92 at 9.) M. Belden did not immediately respond and began working on the job for about a week without an agreement and then rejected that proposal. (*Id.*)

177.    According to M. Belden, he then made a counteroffer to Bolen do the Work for "time and materials." (Doc. 91 at 48.) When M. Belden was asked "[a]nd did Mr. Bolen tell you that billing him on a time and materials basis was acceptable," M. Belden responded, "[h]e never really gave me a straight answer on that." (Doc. 92 at 17.)

178.    Nonetheless, the Court finds that Bolen accepted his time and materials proposal during the conversations which followed Belden's rejection of the scrap proposal. First

40

Bolen said, "[t]he Department of Natural Resources is on me. I've got to get it done. Can you see what it takes to get it done." (Doc. 91 at 48.)

179.    Next, after Belden started the job, Belden again told Bolen that time and materials was "the only way I could do the job" to which Bolen responded, "[t]he DNR was pressuring him to do the job, so do what it takes to get the job done." (Doc. 92 at 17.)

180.    And when Belden told Bolen that Pharaoh would be invoiced for time and materials, there was "no negativity" from Bolen and indeed, after Belden sent the invoices, M. Belden testified "I was getting partial payments." (*Id.* at 18.)

181.    While, obviously, a written agreement would have been wiser and reduced if not eliminated entirely the uncertainty about the payment terms, the Court finds Belden's testimony on this critical issue to be credible and supported by the following corroborating evidence.

182.    First, the Court finds that the $740,000 paid by Pharaoh to Belden were indeed partial payments for time and materials and not loans. As covered in detail above, Bolen's testimony that these were loans was inconsistent, internally conflicting, nonsensical, and not believable.

183.    Second, in a letter to Gary Bolen from Mary Margaret Hamilton of SWEPI, she wrote that "[t]his confirms a $200,000 disbursement made by SWEPI to Pharaoh Oil & Gas, Inc. on November 14, 2014, in response to Pharaoh's request. . . . You have advised that this advancement is *for Pharaoh to pay Martin Belden for work that Mr. Belden has executed for Pharaoh.*" (Plaintiff's Exhibit 11 at Belden Trial 505, emphasis added.)

184.    Third, the Completion Agreement proposed by Pharaoh and signed by Bolen (but rejected by Belden) says nothing about the supposed "loans" or their repayment.

(Defendant's Exhibit 6.) Rather it says "Pharaoh owes no *further* compensation or debt [to Belden] unless and until the appropriate agency of the State of Louisiana" approves the Work at which time Pharaoh agrees to pay Belden $1,200,000. (*Id.* at PHA 31, emphasis added.) This $1,200,000 appears to be in addition to the $740,000 already paid.

185.     Pharaoh argues alternatively that, even if the Court rejects its argument that Belden was to be paid for scrap recovered from the Site, there was still no meeting of the minds and therefore, under Louisiana law, the Court must set a "reasonable price" to compensate Belden for the Work performed. (Doc. 93 at 20–22, ¶¶ 58-2d 58.)

186.     It is true that, even according to Belden's sworn testimony, Bolen's acceptance of the time and materials was less that crystal clear. As mentioned above, when M. Belden initially told Bolen that Belden would only do the Work on a time and materials basis, M. Belden admitted that Bolen "never really gave [him] a straight answer on that." (Doc. 92 at 17.)

187.     However, later, after Belden started Work at the Site, he again told Bolen that time and materials was "the only way I could do the job" and Bolen responded that "[t]he DNR was pressuring him to do the job, so do what it takes to get the job done." (*Id.* at 17.)

188.     And when he told Bolen that Pharaoh would be invoiced for time and materials, Bolen expressed "no negativity" and indeed, after Belden sent the invoices, M. Belden testified "I was getting partial payments." (*Id.* at 18.)

189.     The applicable law governing the issue of whether Bolen consented to Belden's time and material terms is found in *Illinois Central Gulf Railroad Co. v. International Harvester Co.*, 368 So. 2d 1009 (La. 1979).

> Every contract or modification of a previously concluded agreement requires the concurrence of the consent of the parties. La. C.C. arts. 1766,

1779(2), 1798. Consent results from a free and deliberate exercise of the will of each party where the intent has been mutually communicated or implied, La. C.C. art. 1819, and accepted by the party to whom a proposal is made. La. C.C. arts. 1798, 1800.

Consent may be given either expressly or by implication, La. C.C. arts. 1780, 1811, but the cases in which consent is implied are particularly determined by law. La. C.C. art. 1781. According to the civil code, consent may be implied in the following instances:

> ". . . when it is manifested by actions, even by silence or by inaction, in cases in which they can from the circumstances be supposed to mean, or by legal presumption are directed to be considered as evidence of an assent." La. C.C. art. 1811.
> . . .
> "(W)hen (actions without words) are done under circumstances that naturally imply a consent to such contract. . . . " La. C.C. art. 1816. See also, La. C. C. art. 1817.

Thus, except in those instances in which the statutory law creates a legal presumption, the mere silence of an offeree should not, in principle, be considered as involving acceptance on his part. His consent can result from silence, however, when combined with other facts or acts so as to imply or indicate his consent unequivocally. 1 Civil Law Translations Aubry & Rau, Obligations, s 343, p. 307 (1965). See, *Governor Claiborne Apartments, Inc. v. Attaldo*, 256 La. 218, 235 So.2d 574 (1970). In cases where the law does not expressly create a legal presumption of consent from certain facts, it is left to the discretion of the judge to determine if consent is to be implied from the particular circumstances of the case. La. C.C. art. 1818*; Pooler Bldg. Mats. Inc. v. Hogan, 244 So.2d 62* (La. App. 1st Cir. 1971).

*Id.* at 1011–12.[23]

190.    Similarly, in the recent case of *Chubb Capital I Ltd. v. New Orleans City*, 732 F. Supp. 3d 558 (E.D. La. 2024), the district court stated:

Indeed, "[c]onsent may be given either expressly or by implication*."* [*Illinois Cent.*, 368 So. 2d at 1011] (citing LA. CIV. CODE arts. 1780 & 1811). "Thus, except in those instances in which the statutory law creates a

---

[23] Title IV of Book III of the Louisiana Civil Code of 1870, "Of Conventional Obligations," was revised, amended, and re-enacted by Acts 1984, No. 331 § 1, effective January 1, 1985, to consist of Articles 1906 through 2057. Critical to this case, Articles 1816 and 1817 of the 1870 Code have been reproduced in the current Articles 1927, 1939–1942 without a substantive change to the law. *See* Revision Comments to La. Civ. Code arts. 1927, 1939–42. Thus, the primary articles relied upon by the Supreme Court in *Illinois Central* and that court's analysis remain relevant to the instant analysis.

> legal presumption, the mere silence of an offeree should not, in principle, be considered as involving acceptance on his part. His consent can result from silence, however, when combined with other facts or acts so as to imply or indicate his consent unequivocally." *Id*. at 1012 (emphasis added). In such cases, "it is left to the discretion of the judge to determine if consent is to be implied from the particular circumstances of the case." *Id*.

*Id.* at 567–68 n.30.

191.     Thus, while Bolen did not say specifically that he "accepted" or "agreed to" Belden's offer of time and materials, when Belden again told Bolen that time and materials was "the only way I could do the job" and Bolen responded that "[t]he DNR was pressuring him to do the job, so do what it takes to get the job done" (Doc. 92 at 17), Bolen's response constituted an express acceptance of the Belden's terms of payment.

192.     To the extent, however, that Bolen's response was not an express agreement, then Bolen's failure to timely object combined with his payment of $740,000 towards Belden's time and materials "imply or indicate his consent unequivocally." *Illinois Cent.*, 368 So. 2d at 1012.

193.     The Court notes, finally, that even if Pharaoh is correct that there was no meeting of the minds between Pharaoh and Belden and therefore the Court should set a "reasonable price" for Belden's services, the Court finds that the time and materials as invoiced by Belden, (Plaintiff's Exhibits 1A – 1L) totaling $1,673,073.61 (Plaintiff's Exhibit 2-a), is a reasonable price.

194.     And while Pharaoh complains that it was "ostensibly able to complete the other half of the work for about $360,000[,]" thus rendering Belden's invoiced amount unrealistic (Doc. 93 at 22, 2d ¶ 58), Pharaoh also says that the $360,000 was spent not for completing the work but for something unrelated: "to remediate the mess at Bayou Sorrel, the fire and

the oil spill" (*id.* at 8, ¶ 21). Regardless, the Court finds the sum billed by Belden is reasonable.

### 2. Did either or both parties breach the oral contract?

195.    Based on the record as a whole, by a preponderance of the evidence, and for reasons detailed above, the Court concludes that Pharaoh substantially breached the Oral Contract by failing to pay Belden for all of the services it provided, thus giving Belden good and just cause to terminate the Work and leave the Site. "[W]here one party substantially breaches a contract, the other party to it has a defense and an excuse for nonperformance." *LAD Servs. of Louisiana, L.L.C. v. Superior Derrick Servs., L.L.C.,* 2013-0163 (La. App. 1 Cir. 11/7/14), 167 So. 3d 746, 755 (quoting *Commerce Ins. Agency, Inc. v. Hogue*, 618 So. 2d 1048, 1052 (La. App. 1 Cir. 1993). "[A] breach is substantial if it is an "actual cause of [in this case Belden's] failure to comply with its obligations." *Whitney Bank v. SMI Companies Glob., Inc*., No. 16-1427, 2018 WL 3027021, at *4 (W.D. La. June 14, 2018) (quoting *LAD Servs.* 167 So. 3d at 756); *Session Fixture Co., Inc. v. Pride Mktg. & Procurement, Inc*., No. 16-9373, 2016 WL 7210349, at *5 (E.D. La. Dec. 13, 2016).

196.    Pharaoh contends that it is undisputed that Belden left the Site without finishing the Work, (Doc. 93 at 18, ¶ 50), and from this undisputed fact argues that it is entitled to the amounts Pharaoh had to expend to finish the Work, (*id*., citing La. Civ. Code arts. 1994, 1995; *see also* Doc. 95 at 10). But this argument presupposes that Belden quit the Work without good cause, and the Court rejects that argument since Pharaoh's failure to pay was a substantial cause of Belden leaving before the Work was complete. Furthermore, since Belden was only partially compensated for Work it did before leaving, Pharaoh owes Belden and not the other way around. Pharaoh breached the Oral Contract. Belden didn't.

197.    In its counterclaim Pharaoh additionally alleges entitlement to "$1 million caused by Belden's poor and incomplete workmanship." (Doc. 54 at 8, ¶ 31.) However, the evidence does not support this allegation. When asked whether Belden did the job in a workmanlike manner, Bolen failed to specify any specific failure or damage resulting from Belden's alleged unworkmanlike performance saying only that "Belden is a junkyard dog like me and he was doing junkyard dog work." (Doc. 92 at 78.) Bolen was asked on cross examination, "[a]nd, in fact, you were of the opinion that [M. Belden] was doing a good job. Correct?" (*Id.* at 113.) He responded, "I was of the opinion he was getting things done, but it was awful slow." (*Id.*) Later, Bolen reiterated this testimony: "The question was does he do substandard work. I said he was a little bit slow and Martin's a good worker. I didn't say that he's - - he does substandard work." (*Id.* at 114–115.)

198.    Therefore, the Court finds that Pharaoh has failed to prove Belden's breach of contract for poor workmanship before he left the Site and any damages resulting therefrom.

**3.  What are the damages owed by Pharaoh to Belden for breach of contract?**

199.    While there was conflicting testimony on when and by what method the invoices were sent and received, and while Pharaoh has pointed the Court to alleged inconsistencies in the invoicing, the Court finds by a preponderance of the evidence that the invoices correctly reflect the time spent and materials used by Belden and its contractors to do the Work.

200.    In response to cross examination questions, M. Belden explained in detail how he charged for his services including the use of his equipment and that of third parties, and how his company made a profit. (*Id.* at 12–16, 42–43.)

201.    M. Belden, (Doc. 91 at 48–55), and his son, (Doc. 91 at 10–22), testified generally about the work his company did while Belden was on Site. While Bolen complained that Belden's work was "awful slow[,]" Bolen had no complaints about the quality of the Work Belden performed, (Doc. 92 at 78, 113–115), nor did Bolen testify that Pharaoh was billed for work that was not performed. Other than Bolen's unsubstantiated remarks, no proof was offered that the numbers were "made-up."

202.    Belden's invoices were introduced without objection. (Doc. 91 at 4–5.) Pharaoh complains that "the purported invoices reflect payments to laborers and other entities, yet Belden failed to call any of these potential witnesses at trial or merely get an affidavit corroborating any of the work reflected in these invoices." (Doc. 95 at 5.) Yet Pharaoh fails to point the Court to any authority for its suggestion that such testimony or affidavit is necessary as a matter of proof, and the Court knows of no such requirement. It is telling that none of the individual charges or supporting documents were challenged or questioned during trial.

203.    Pharaoh argues that it is strange that the invoices issued over months were sequential in number but, as explained by M. Belden, "[t]hat was the only job I had going on at that time. And that's how my wife made the invoice numbers." (Doc. 92 at 22.)

204.    Pharaoh points out that the payments made by Pharaoh did not correspond to the amounts invoiced. But, as explained by M. Belden, Bolen "tells me that['s] the way that that worked, as they progressed with the job, they was going to get a draft for the money that they had the kitty for to do the cleanup and as it progressed so far as he would pay me as we went." (Doc. 91 at 61.)

205.    Belden initially claimed that it was owed $792,534.54. (Doc. 98 at 15–16, ¶¶ 80–81.) It arrived at this number by starting with the summary invoice showing a total of $1,673,073.61 billed to Pharaoh, (Plaintiff's Exhibits 2-a and 2-b), and subtracting the amount received by Belden for sale of scrap ($185,188.91) and the amounts Belden received from Pharaoh in partial payments ($740,000), (Doc. 98 at 12, ¶ 61, citing Doc. 92 at 25–26, 99–100; *id.* at 15–16, ¶ 81, citing Plaintiff's Exhibit 2-b; *see also id.* at 23–24, ¶ 108 and Doc. 99 at 10, citing Plaintiff's Exhibit 2-a at 433 and Doc. 92 at 25–26, M. Belden Testimony).

206.    However, in confirming Belden's numbers, it was obvious to the Court that Belden had erred since, using the numbers proposed by Belden, the amount owed Belden would be $747,884.70, not the $792,534.54 it was claiming. It also appeared to the Court that, based on the testimony of M. Belden, $50,000 of the $740,000 credit given to Pharaoh was not for work done in connection with the Oral Contract but for separate work requested by Elden Miller to complete work undertaken by Dickie LeBlanc.

207.    Therefore, the Court ordered Belden to "explain in detail (and with citations to the record) how it arrived at the number it says it is entitled to, i.e. $792,543.54 . . ." (Doc. 100.) The Court also ordered Belden to explain whether Pharaoh's $50,000 payment of August 14, 2013, was properly credited to Belden against amounts owed under the Oral Contract. (*Id.*) The Court gave Pharaoh seven days thereafter to "respond." (*Id.*)

208.    In its pocket brief, Belden admitted that it had erred in its original calculations and submitted additional calculations based on record evidence and also stated that "Belden does not now seek to recoup" the $50,000 credit it gave to Pharaoh for the Dickie LeBlanc

work. (Doc. 101 at 5.) Based on the above, Belden now claims $747,884.70 from Pharaoh. (*Id.* at 3, 5.)

209.     In its response to the Court's order, Pharaoh fails to respond as directed to the two items mentioned in the order, i.e., how Belden calculated its damage figure and whether Pharaoh should be credited with the August 2013 payment of $50,000. (Doc. 102.) Rather, it reasserted arguments previously made (*Id*. at 1-2, 5) and made new arguments regarding alleged specific inconsistencies in the invoices. (*Id*. at 2-4). The Court has already addressed Pharaoh's prior arguments. As to the new arguments, the Court notes a) the arguments are not responsive to the Court's order; b) Pharaoh had ample opportunity in pretrial and posttrial briefing to make these arguments but did not; c) Pharaoh had ample opportunity to raise these points during Bolen's direct examination and/or M. Belden's cross examination but did not; and d) because these arguments are made in reply to Pharaoh's brief, Belden did not have the opportunity to respond.[24] For these reasons, the Court will not consider them.

210.     The Court finds that the corrected calculations by Belden are supported by the record evidence and that the damages sustained by Belden for Pharaoh's breach of contract, i.e., Pharaoh's failure to pay all amounts owed, are $747,884.70.

---

[24] The Court need not consider arguments made for the first time in a brief to which the opponent has no opportunity to respond. *General Sec. Nat'l Ins. Corp. v. Celi*, No. 23-1682, 2024 WL 4231371, at *5 (M.D. La. Aug. 29, 2024), *report and recommendation adopted*, No. 23-1682, 2024 WL 4229939 (M.D. La. Sept. 18, 2024); *Santos v. Baton Rouge Water Works Co*., No. 18-1098, 2021 WL 1227875, at *11 (M.D. La. Mar. 31, 2021) (deGravelles, J.) ("Courts in the Fifth Circuit have determined that new arguments raised for the first time in a reply brief need not be considered." (citing *Eitzen Bulk A/S v. Capex Indus., Ltd*., No. 10-395, 2010 WL 5141257, at *3 (E.D. La. Dec. 13, 2010); *Cooper v. Faith Shipping*, No. 06-892, 2008 WL 5082890, at *4 (E.D. La. Nov. 25, 2008); *Benefit Recovery, Inc. v. Donelon*, 521 F.3d 326, 329 (5th Cir. 2008*)*; *Elwakin v. Target Media Partners Operating Co. LLC*, 901 F. Supp. 2d 730, 745–46 (E.D. La. 2012); *Murillo v. Coryell Cty. Tradesmen, LLC*, No. 15-3641, 2017 WL 1155166, at *3 (E.D. La. Mar. 28, 2017))).

### 4. Was the Oral Contract an open account and is Belden owed attorney fees?

211.    Belden contends that Pharaoh's obligation was an open account thus entitling it to attorney fees in additional to the principal amount owed. (Doc. 98 at 16–19, ¶¶ 82–92.)

212.    Pharaoh responds that in order for the alleged debtor (Pharaoh) to be liable for an open account claim by the claimant (Belden), the claimant must send the debtor a written demand correctly setting forth the amount owed. (Doc. 95 at 9, citing La. Rev. Stat. § 9:2781.) Here, Pharaoh argues that since Belden's previous demands were not the same as that made now and has varied over time, this is not an open account claim and attorney fees are not owed. (*Id.*)

213.    Belden counters that the amount "Pharaoh [] received in writing [by] demand [well in advance of trial] for $792,530.54 [is] essentially the amount" Belden is now claiming at trial. (Doc. 98 at 19, ¶ 91.) Belden acknowledges that the demand amount made in its initial Third-Party Demand of $887,386.67, (Doc. 1-4 at 21–24), "incorrectly stated the amount owed[,]" (Doc. 98 at 19, ¶ 91). Belden argues elsewhere that the amount demanded in the Pretrial Order filed on April 29, 2024, constitutes sufficient written demand. (*Id.* at 19, ¶ 89.) Finally, Belden argues that the "outstanding balance on the invoices claimed by Belden of $792,534.54 at trial essentially matches the amount indicated within the invoice for payment which had been received by Pharaoh and which Gary Bolen confirmed was a demand by Belden for payment." (*Id.* at 18, ¶ 88.)

214.    Pharaoh responds however, that the "correct amount" requirement found in La. Rev. Stat. § 9:2781 has been strictly construed and that Belden's previous demands which "essentially match" the amount now demanded fails to satisfy the statute. (Doc. 93 at 23, ¶ 61.). Furthermore, there is no authority for Belden's argument that the Pretrial Order

constitutes a demand for purposes of the statute, but even if there was, the amount alleged

in the Pretrial Order is different than the amount now requested. (*Id.* at 26, ¶ 67.)

215.    Louisiana Revised Statutes § 9:2781(A) states, in pertinent part:

> When any person fails to pay an open account within thirty days after the claimant sends written demand therefor correctly setting forth the amount owed, that person shall be liable to the claimant for reasonable attorney fees for the prosecution and collection of such claim when judgment on the claim is rendered in favor of the claimant.

La. Rev. Stat. § 9:2781(A).

216.    "Subsection A of § 9:2781 makes a debtor liable for the claimant's open

account claim only if the claimant sends the debtor a 'written demand . . . correctly

setting forth the amount owed . . .'" *Hayne v. Hardy*, 802 F.2d 826, 829 (5th Cir.

1986) (quoting La. Rev. Stat. § 9:2781(A)).

> The Louisiana Supreme Court has interpreted the "correct amount" requirement with great stringency, holding that a claimant cannot recover fees under § 9:2781 unless the court decides that he is entitled to the full amount requested in the written demand sent at least 30 days before trial. If a claimant's bill is adjusted by the court to any degree whatsoever, the claimant is held to have failed to meet the statutory requirement of giving notice as to the correct amount owed. . . .
>
> These cases demonstrate that under the Louisiana statute nothing short of a complete recovery in court of the amount demanded before trial will suffice to fulfill the requirements of § 9:2781. [*Irwin Brown Co. v. Morton's Auction Exchange*, 446 So. 2d 403 (La. Ct. App. 1984),] demonstrates that a claimant can fail under § 9:2781 if his underlying claim is only partly meritorious, and [*Cook v. O'Pry*, 448 So. 2d 891 (La. Ct. App. 1984),] demonstrates that he can fail even though the underlying claim may be entirely meritorious but the total amount claimed is faulty. Finally, there is no hint in these cases that the demand requirement of § 9:2781 is to be relaxed when the underlying claim is for attorney fees on the ground that such claims are inherently variable. The statute requires that the "correct" amount must be stated. We cannot infer a limitation on this provision. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 [ ] (1938).

*Id.* at 829–30. *See also Frank L. Beier Radio, Inc. v. Black Gold Marine, Inc.*, 449 So. 2d 1014, 1016 (La. 1984) ("We find that it makes no difference that the excessive amount billed to Black Gold was interest rather than principal. [La. Rev. Stat. §] 9:2871 strictly construed requires no inquiry into the reason for the error in the amount demanded. It simply requires 'written demand . . . correctly setting forth *amount owed* . . .', as a prerequisite to liability for attorney fees."); *Kaye v. Karp*, 19-194 (La. App. 5 Cir. 12/30/19), 286 So. 3d 1281, 1288–89 (stating that "[t]he demand letter must correctly set forth the amount due at the time the letter was written," and denying recovery in part because of a $100.03 mathematical error in the demand); 1A Frank L. Maraist, *Louisiana Civil Law Treatise* § 10.2 (2002) (stating that § 9:2781 "is strictly construed. Thus the demand letter must state accurately the amount due; any variation between the amount demanded and the actual balance may bar recovery of attorney's fees").

217.    Belden's last invoice to Pharaoh (made before Pharaoh paid $200,000 in November, 2014) was $992,530.54. (Plaintiff's Exhibits 2-a and 2-b.) When the $200,000 payment is deducted, Belden invoiced $792,530.54, which is different than the amount now claimed by Belden of $792,534.54.[25] Belden's demand letter of February 23, 2016, made a net demand of $887,386.68. (Doc. 1-4 at 26.)[26] Belden's demand in its Petition was the same. (Doc. 1-3 at 5–6, ¶¶ VIII, IX and XI.) While Belden argues that the amount demanded in the Pretrial Order filed on April 29, 2024, constitutes sufficient written demand, (Doc. 98

---

[25] The amount demanded in Belden's pretrial and posttrial Proposed Findings of Fact and Conclusions of Law is $792,534.54. (Doc. 77 at 2, ¶ 8; Doc. 98 at 15–16, ¶ 81.)

[26] Pharaoh argues additionally that this demand letter was not introduced into evidence as required by La. Rev. Stat. § 9:2781(B). (Doc. 93 at 34 n.77.)

at 19, ¶ 89, citing no authority), Belden's claim in the Pretrial Order is for $792,530.54[27] (Doc. 57 at 4), which again is different from the amount it now says it is owed.

218.     The Court finds that Belden fails to satisfy the stringent requirements of La. Rev. Stat. § 9:2781(A) in that it fails to show that it sent written demand to Pharaoh "correctly setting forth the amount owed[.]" The fact that invoices received by Bolen may have "essentially matched" the amount claimed by Belden (*see* Doc. 98 at 18–19, ¶¶ 88, 91) is of no moment even if Belden is right when it argues that Bolen confirmed that the invoice was a demand for payment (*id.*, citing Doc. 92 at 25–26.)[28] Even if the amount demanded in the Pretrial Order can be considered a written demand for purposes of § 9:2871(A) (and Belden has pointed this Court to no such authority), the amount stated there is different than the amount now claimed.

219.     In conclusion, the Court finds that Pharaoh's obligation to Belden was not an open account and denies Belden's claim for attorney fees.

### 5. Did Belden breach the Letter Agreement?

220.     In the Letter Agreement, M. Belden and his company "agree[d] not to interfere with the Work in any way conceivable, including but not limited to *appearing at the site of the Work . . .*" (Defendant's Exhibit 7 at PHA 34, emphasis added; *see also generally* Doc. 93 at 6–8, ¶¶ 12–24; Doc. 98 at 4–7, ¶¶ 13–32.)

221.     The Letter Agreement also "prohibited Belden from returning to or interfering with the Work as defined in the agreement." (Doc. 93 at 7, ¶ 16.) Bolen testified that the reason this provision was placed in the Letter Agreement was because "there are so many thieves

---

[27] Belden's representation in briefing that the "Pretrial Order…indicates in writing that outstanding balances on the Belden invoices totals $792,534.54" is incorrect. The Pretrial Order states that the outstanding balance is $792,530.54. (PTO, Doc. 57 at 4.)

[28] The Court has reviewed those pages, and Bolen makes no such concession.

down there, that night somebody got the fuel barge and took off with it and we never saw it again." (Doc. 92 at 72; *see also id.* at 132–132 (agreeing that the provision was placed in the Letter Agreement because of "a concern about things walking off the job. . .").)

222.    Pharaoh's Bolen admits he subsequently gave permission for Belden to return to the site on one occasion so that Belden could do work for a third party (*Id.* at 72–74; *id.* at 116–118, 132–133.) But M. Belden returned "at least three different times." (Doc. 93 at 7, ¶ 18.)

223.    "While Belden was on Site, arguably in violation of the Letter Agreement, a flow line test resulted in an oil spill and fire" for which Pharaoh seeks to hold Belden accountable. (*Id.* at 7–8, ¶ 19; *see also id.* at 8, ¶¶ 20–24.)

224.    Belden testified that when the third-party job came up, he spoke to Bolen about it and Belden said to Bolen: "you told me not to go on your facility. You and I have an agreement. Can I go out there and do it?" (Doc. 91 at 97.) In reply, according to M. Belden, Bolen said, "Yeah you can go out there and do it. [Bolen] gave me his blessing to go out there and do it." (*Id.*)

225.    Bolen admitted he gave Belden permission to return to the Site but testified, "We thought he was just going to be out there one time." (Doc. 92 at 117.)

226.    First, the Court finds M. Belden's testimony on this issue is credible and accepts it. Furthermore, even if the Court credits Bolen's testimony, the result would be the same. Bolen did not tell M. Belden he could return to the Site for only one visit; rather he told M. Belden "that he could go do what he needed to do." (*Id.* at 132–133.) It was simply Bolen's impression that Belden would be there only one time. (*Id.* at 117.) Furthermore, Bolen's testimony makes clear that it was not Pharaoh's intent to pursue Belden for this alleged

breach of the Letter Agreement. "And he [M. Belden] went out there and the lawyer said, 'Well, he breached the contract.' I said, 'Just leave Martin alone. He's okay. We'll figure it all out.'" (*Id.* at 117–118.)

227.     The Court therefore finds that Belden did not breach the Letter Agreement when he returned to the Site on more than one occasion because the Letter Agreement was orally modified by the parties' mutual agreement which is permissible under Louisiana law.

> First, a written contract can be orally modified at any time, regardless of whether the written contract provides that it can only be amended in writing. *Schindler Elevator Corp. v. Long Prop. Holdings, LLC*, 50,199 (La. App. 2 Cir. 11/18/15), 182 So. 3d 233, 241 ("[A] contract that is not required by law to be in writing may be modified by a subsequent oral agreement, and parol evidence is admissible to prove the modification. Even contracts that contain a provision specifying that it may only be modified in writing may be subsequently modified by oral agreement."); *Driver Pipeline Co., Inc. v. Cadeville Gas Storage, LLC*, 49,375 (La. App. 2 Cir. 10/1/14), 150 So. 3d 492, 500 ("A written construction contract may be modified by oral agreement and by the conduct of the parties, even when the contract provides that change orders must be in writing."); *Monroe v. Physicians Behav. Hosp., LLC*, 49,248 (La. App. 2 Cir. 8/13/14), 147 So. 3d 787, 796 ("Even underlying contracts which contain provisions specifying that the contract may only be modified in writing may be subsequently modified by oral agreement.").

*Urda v. Valmont Indus. Inc.*, 561 F. Supp. 3d 640, 651 (M.D. La. 2021) (deGravelles, J.); *see also Retina & Vitreous of Louisiana, Inc. v. Mason*, No. 23-158, 2024 WL 3307848, at *8 (M.D. La. Mar. 1, 2024) (deGravelles, J.).

228.     However, even if Belden did breach the Letter Agreement, his return was in good faith, and the damages claimed by Pharaoh for the alleged breach[29] would not be

---

[29] Bolen testified that it cost Pharaoh "about three hundred and sixty thousand dollars" to respond to the fire and oil spill. (Doc. 92 at 76.) Bolen reviewed with the Court the invoices in connection with that testimony. (Doc. 92 at 76–78, reviewing Plaintiff's Exhibit 8.)

recoverable because they are not a foreseeable consequence of any breach. Louisiana Civil Code article 1996 states: "An obligor in good faith is liable only for the damages that were foreseeable at the time the contract was made." La. Civ. Code art. 1996.

229.     Pharaoh argues that by returning to the Site in violation of the agreement and causing the oil spill and fire, Belden is liable for "foreseeable damages" under La. Civ. Code arts. 1994–1996. (Doc. 93 at 18, ¶¶ 50–52.)

230.     Pharaoh maintains the damages were foreseeable because Pharaoh, unaware that Belden would return on more than the occasion where he was given permission to return, "anything Belden did" under these circumstances would be foreseeable and therefore "Belden should be responsible for all of the damages caused by the fire and spill." (*Id.* at 18–19, ¶ 52.)

231.     But Pharaoh ignores Bolen's testimony that the reason for the provision in the Letter Agreement prohibiting M. Belden's return to the Site was Bolen's concern that equipment was being stolen from the Site by unknown third parties. Bolen said that the Letter prohibiting return "was sent to [M. Belden] and a few other people too." (Doc. 92 at 131–132.) Therefore, at the time the Letter Agreement was entered into, it was not a foreseeable concern or cause of the agreement that Belden's work with third parties would result in a fire and oil spill.

232.     Therefore, the Court finds that Belden did not breach the Letter Agreement, but, in any event, there were no foreseeable damages arising from the alleged breach.

**6.    Is Pharaoh owed tort damages for the damages caused from the oil spill and fire?**

233.      Pharaoh argues additionally, or in the alternative, that Belden negligently caused the fire and oil spill and so is liable to Pharaoh in tort for the damages caused. (PTO, Doc. 57 at 6–7; *see also* Doc. 54 at 7–9, ¶¶ 29–32 and prayer; Doc. 93 at 18–20, ¶¶ 50–57.)

234.      Belden argues that because the fire and oil spill occurred March of 2015 and the claim made by Pharaoh against Belden was made on August 15, 2016, the claim has prescribed. (Doc. 99 at 6, citing Bolen's Testimony, Doc. 92 at 125, and Pharaoh's Answer, Affirmative Defenses and Reconventional Demand, Doc. 1-4 at 39–44.)

235.      Pharaoh does not argue that its tort claim has not prescribed. (Doc. 93 at 18–19.) Rather, it maintains that "[e]ven if the Court finds that Pharaoh's counterclaim is prescribed or that the Letter Agreement was not breached, Pharaoh is entitled to an offset based on Belden's negligence." (Doc. 93 at 19, ¶ 53; *see also id*. at 19–20, ¶¶ 53–57, citing La. Code Civ. Proc. art. 424; *see also* Doc. 95 at 12.) Specifically, Pharaoh maintains that it is still entitled to an offset "based on Belden's abandonment of the Work then negligence at the Site" which, argues Pharaoh, "cost Pharaoh money as well as the opportunity for millions of dollars from Shell." (Doc. 93 at 20, ¶ 57.)

236.      To the extent that Pharaoh argues entitlement to damages arising from "Belden's abandonment of the Work. . .[,]" (*id.*), that argument is rejected since the Court has found that Belden was justified in leaving the Site because of the failure of Pharaoh to pay Belden, and, thus, Belden did not breach the Oral Contract.

237.      As to Pharaoh's tort claim against Belden for these damages, the claim has clearly prescribed since the counterclaim by Pharaoh alleging Belden's negligence was filed more

than one year after the alleged negligence. La. Civ. Code art. 3492.[30] Pharaoh doesn't argue

otherwise.

### 7. Is Pharaoh entitled to an offset or credit?

238.       Louisiana Code of Civil Procedure article 424 states in pertinent part:

> A person who has a right to enforce an obligation also has a right to use his
> cause of action as a defense.

> Except as otherwise provided herein, a prescribed obligation arising under
> Louisiana law may be used as a defense if it is incidental to, or connected
> with, the obligation sought to be enforced by the plaintiff.

La. Code Civ. Proc. art. 424.

239.

> Under this article, Louisiana courts have allowed reconventional demands
> to stand, even when they otherwise would have been prescribed, as long as
> they are incidental to, and directly connected with the obligation sought to
> be enforced. *Dixie Bldg. Materials Co., Inc. v. Bob L. Whittington &
> Associates, Inc.*, 588 So. 2d 78 (La. 1991); *Hennessey Const. Corp. v.
> Halpern*, 06-1099 (La. App. 4 Cir. 1/31/07), 952 So. 2d 739, 741.

*Lamar Contractors, LLC v. SRF Grp. Consulting, LLC*, 22-212 (La. App. 5 Cir. 2/1/23),

358 So. 3d 885, 890, *writ denied*, 2023-00298 (La. 5/23/23), 360 So. 3d 1262.

240.       The "obligation sought to be enforced by [Belden]" arises from Pharaoh's breach

of contract for failing to pay Belden for work done in connection with the Oral Contract.

The "prescribed obligation" allegedly breached is Belden's negligence in starting a fire and

creating an oil spill while performing work for a third party which was neither "incidental

to [nor] connected with" the work performed by Belden in connection with the Oral

Contract. La. Code Civ. Proc. art. 424. Nor does the Court find the two obligations are

---

[30] Effective July 1, 2024, La. Civ. Code art. 3492 was repealed and replaced by La. C.C. art. 3493.11 making delictual
actions subject to a liberative prescription of two years. This change does not affect the present case.

"directly connected," *Lamar Contractors*, 358 So. 3d at 890. Therefore, Pharaoh is not entitled to an offset for any damages caused by Belden's alleged negligence in creating the oil spill and fire, and the Court need not determine whether Belden was negligent in starting the fire and creating the oil spill.

## VI.    CONCLUSION

241.     In conclusion and for the reasons stated above, the Court will grant judgment in favor of Belden Investments, L.L.C. and against Pharaoh Oil & Gas, Inc. on the main demand in the principal sum of $744,884.47, plus pre-judgment interest on the total amount of damages from the date of judicial demand until the entry of judgment, at the rate fixed by La. Rev. Stat. § 13:4202, and post-judgment interest on the total amount of damages from the date of judgment until paid, at the rate fixed by 28 U.S.C. § 1961.

242.     In addition, the Court will grant judgment in favor of Belden Investments, L.L.C. and against Pharaoh Oil & Gas, Inc. denying Pharaoh's counterclaims against Belden.

243.     Belden will, within two (2) days of these Findings of Fact and Conclusions of Law, after consulting with Pharaoh, submit a proposed judgment indicating if it is, or is not, approved as to form by Pharaoh.

Signed in Baton Rouge, Louisiana, on <u>March 7, 2025</u>.

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**